# COURT OF APPEALS.

## July 12, 1922.

## THE PEOPLE v. BENJAMIN GITLOW.

### (234 N. Y. 132.)

(1) CRIMINAL ANARCHY—EXERCISE OF LIBERTY OF SPEECH AND PRESS.

The phrase "Liberty of speech and of the press" means that every man shall have a right to speak, write and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure any person in his rights, person, property or reputation, and so always that he does not thereby disturb the public peace, or attempt to subvert the government. It places no restraint upon the power of the Legislature to punish the publication of matter which is injurious to society according to the standard of the common law. It does not deprive the State of the primary right of self-preservation. It does not sanction unbridled license, nor authorize the publication of articles prompting the commission of murder or the overthrow of government by force. One of the great rights secured to citizens of this country is that of free and fearless discussion of public questions, including even the merits and shortcomings of our government. But the difference between such forms of discussion and the advocacy of the destruction of government itself by means which are abhorrent to the entire spirit of our institutions is clear.

(2) SAME—PENAL LAW, §§ 160, 161, CONSTITUTIONAL.

Sections 160 and 161 of the Penal Law define criminal anarchy and make the advocacy of such doctrine either by word of mouth or writing or by the publication, circulation, sale, distribution or public display of any book, paper, document or written or printed matter in any form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or otherwise, a felony punishable by imprisonment or by a fine or both. The sections apply to writings which advocate the destruction of organized government as it exists in this country. They are constitutional and the enactment thereof was a valid exercise of the powers of the Legislature. To advocate the destruction of the government of the city of New York, or of the State of New York, or of the United States by force or by unlawful means, such as the mass strike, is a violation of these sections of the Penal Law.

(3) SAME—ARTICLE IN REVOLUTIONARY AGE HELD TO BE IN VIOLATION OF STATUTE.

Where a paper called *The Revolutionary Age,* purporting to be the official organ of the Left Wing Socialists who desire to bring about the communistic state by revolution and violence, published by defendant, contained an article or manifesto which advocated at great length and much force the overthrow of the organized government of this State and the United States, not by constitutional means, but by revolution, force and violence and by mass strikes in which the proletariat (unskilled laborers without property or capital engaged in the lower grades of work) should usurp and take possession of the functions of organized government and overthrow and destroy it and substitute in the place thereof a temporary dictatorship of the proletariat to be followed by the full and free social and individual autonomy of the communistic order, such publication is not the advocacy of a mere change in the form of government, or a new government, brought about by constitutional or legitimate means, but is an attempt to incite the overthrow of all organized government by revolution and other criminal means, and, therefore, the defendant by publishing such manifesto violated the statute and is guilty of criminal anarchy.

(4) SAME—COMPETENCY OF EVIDENCE OF ̂WHAT TOOK PLACE AT A MASS STRIKE IN A CERTAIN CITY TO SHOW WHAT MANIFESTO MEANT BY ''MASS STRIKE'' ADVOCATED THEREIN.

Where in such manifesto it was stated in advocating mass strikes as a means of overthrowing organized government that ''strikes are developing which verge on revolutionary action, and in which the suggestion of proletarian dictatorship is apparent, the striker-worker trying to usurp functions of government as in Seattle and Winnipeg, the mass struggle of the proletariat is coming into being,'' that statement referred to and accepted the Winnipeg strike as an illustration of what a proletariat dictatorship would mean and was somewhat of a definition of what was meant by mass struggle. The article urges the bringing about by the mass strike, as in Winnipeg, the proletariat dictatorship, and, therefore, evidence of occurrences which took place at Winnipeg during the strike was competent for the purpose of showing what was meant by the author of the manifesto and what would be understood by those who read it.

(5) SAME.

The statute (Penal Law, § 590) provides that where two or more persons conspire to commit any act injurious to the public health, to public morals or to trade or commerce, or for the perversion or the obstruction of justice or of the due administration of the laws, each of them is guilty of a misdemeanor. To advocate, therefore, the commission of this conspiracy or action by mass strike whereby government is crippled, the

administration of justice paralyzed, and the health, morals and welfare of a community endangered, and this for the purpose of bringing about a revolution in the State, is to advocate the overthrow of organized government by unlawful means.

(6) SAME—UNTENABLE ATTEMPT TO EVADE STATUTE BY CLAIM THAT MANIFESTO MERELY ADVOCATED CHANGE IN FORM OF GOVERNMENT.

Defendant contends that the statute under which he was convicted is aimed at the attempt completely and permanently to destroy and overthrow organized government and that it does not include an attempt at mere revolution whereby there is to be substituted for an existing form of organized government another and different form which would still possess the attributes of organized government. If this view is tenable, defendant nevertheless was properly convicted and his exceptions are unavailing, because he was not advocating in the place of our existing government a condition which could be fairly regarded as an organized government. There was no evidence upon which a jury could be permitted to find that the doctrine which he was advocating proposed the substitution of any real form of government in the place of that now existing.

People v. Gitlow, 195 App. Div. 773, affirmed.

APPEAL from a judgment of the Appellate Division of the Supreme Court in the First Judicial Department, entered April 1, 1921, which affirmed a judgment, rendered at a Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of criminal anarchy.

*Walter Nelles, Joseph R. Brodsky*, and *I. E. Ferguson*, for appellant. The Criminal Anarchy Law is unconstitutional. (N. Y. Const., art. 1, §§ 6, 8; People v. Most, 171 N. Y. 423; Penal Law, § 2; People v. Conrad, 102 App. Div. 570, 182 N. Y. 529; People v. Bush, 4 Hill, 133; McDermott v. People, 5 Park. 102; People v. Du Veau, 105 App. Div. 381; People v. Mills, 178 N. Y. 274; People v. Sullivan, 173 N. Y. 122; People v. Gardner, 144 N. Y. 119; People v. Cohen, 223 N. Y. 406; Masses Publishing Co. v. Patten, 244 Fed. Rep. 535.) The conviction rests upon misinterpretation of the Criminal Anarchy Law. (U. S. ex rel. Turner v. Williams, 194 U. S. 279; Von Gerichten v. Seitz, 94 App. Div. 130; Colyer v.

Skeffington, 265 Fed. Rep. 17; United States v. Wiltberger, 5 Wheat. 76; United States v. Lacher, 134 .U. S. 624; Bishop Stat. Cr., § 194; Endlich on Interp. Stat., §§ 329-356; United States v. Clayton, 2 Dill. 219; People v. N. Y. & M. B. Ry. Co., 84 N. Y. 565; People v. Richards, 108 N. Y. 137; Wakefield v. Fargo, 90 N. Y. 213; Bristor v. Smith, 158 N. Y. 157; Burke v. Bosso, 180 N. Y. 341.) It was error to receive evidence as to a strike in Winnipeg. (Odgers on Libel & Slander [5th ed.], 682; Daly v. Byrne, 77 N. Y. 182; Van Ingren v. Mail & Express, 156 N. Y. 376; Nat. P. Assn. v. Cumming, 170 N. Y. 315; Bossert v. Dhuy, 221 N. Y. 342; People v. Molineux, 168 N. Y. 264; People v. Richardson, 222 N. Y. 103; People v. Pettanza, 207 N. Y. 560; People v. Harris, 209 N. Y. 70; People v. Wolf, 183 N. Y. 464; People v. Sharp, 107 N. Y. 427.)

*Joab H. Banton, District Attorney (John Caldwell Myers,* of counsel), for respondent. The criminal anarchy statutes are constitutional. (People v. Most, 171 N. Y. 423; Robertson v. Baldwin, 165 U. S. 275; Schenck v. U. S., 249 U. S. 47; Frohwerk v. U. S., 249 U. S. 204; Matter of Lithuanian Workers' Literature Soc., 187 N. Y. Supp. 612; State v. Moilen, 167 N. W. Rep. 345; State v. Fox, 71 Wash. 185; State v. Hennessy, 195 Pac. Rep. 211; State v. Quinlan, 86 N. J. L. 120; State v. Boyd, 86 N. J. L. 75.) The facts alleged and proved constitute criminal anarchy. (Von Gerichten v. Seitz, 94 App. Div. 130; Thompson v. Caysen, 243 U. S. 68; People ex rel. Hegeman v. Corrigan, 195 N. Y. 1.) The Winnipeg evidence was properly admitted. (People v. Gitlow, 111 Misc. Rep. 645.)

CRANE, J.:

James Larkin, Benjamin Gitlow, C. E. Ruttenberg, and Isaac E. Ferguson were indicted, tried and convicted for the

crime of criminal anarchy as defined by sections 160 and 161 of the Penal Law. So far as applicable to this case the sections read as follows:

" § 160. Criminal anarchy defined. Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means. The advocacy of such doctrine either by word of mouth or writing is a felony.

" § 161. Advocacy of criminal anarchy. Any person who;

" 1. By word of mouth or writing advocates, advises or teaches the duty, necessity or propriety of overthrowing or overturning organized government by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means; or,

" 2. Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means;    *    *    *

" Is guilty of a felony and punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both."

The offense charged against these defendants of which they have been convicted is that they advised and advocated in a socialist paper known as *The Revolutionary Age* the overthrow and destruction of this government by revolution, violence and the mass strike.

This court, I think, is agreed that these provisions of the Penal Law are constitutional. The First Amendment to the United States Constitution and section 8 of article I of the New York State Constitution, which secure the freedom and liberty of speech and of the press, do not protect the violation

of this liberty or permit attempts to destroy that freedom which the Constitutions have established.

We said in People v. Most (171 N. Y. 423, 431): " While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the Constitution, and authority to provide for and punish such abuse is left to the Legislature. The punishment of those who publish articles which tend to corrupt morals, induce crime or destroy organized society, is essential to the security of freedom and the stability of the State. While all the agencies of government, executive, legislative, and judicial, cannot abridge the freedom of the press, the Legislature may control and the courts may punish the licentiousness of the press. * * * Mr. Justice Story defined the phrase to mean ' That every man shall have a right to speak, write and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property or reputation; and so always, that he does not thereby disturb the public peace, or attempt to subvert the government.' (Story's Commentaries on the Constitution, § 1874.) * * * It places no restraint upon the power of the Legislature to punish the publication of matter which is injurious to society according to the standard of the common law. It does not deprive the State of the primary right of self-preservation. It does not sanction unbridled license, nor authorize the publication of articles prompting the commission of murder or the overthrow of government by force. All courts and commentators contrast the liberty of the press with its licentiousness, and condemn as not sanctioned by the Constitution of any State, appeals designed to destroy the reputation of the citizen, the peace of society or the existence of the government."

To the same point reference may be made to Patterson v. Colorado (205 U. S. 454, 462); Schenck v. United States (249

U. S. 47); State v. Fox (71 Wash. 185); State v. Boyd (86 N. J. Law, 79).

These sections of the Penal Law make the publication of a paper or document advocating and advising that organized government be overthrown by force, violence or any unlawful means, a felony.

The Constitution, federal or State, does not authorize publications which advocate the assassination of public officials. (People v. Most, supra.) Neither does it authorize publications advocating the destruction of the government by violence or unlawful means.

The Legislature of this State, therefore, was within its powers when it enacted sections 160 and 161 of the Penal Law.

It is fair to assume that the Legislature had in mind the protection of this State, the States of the Union and of the Union itself. We may fairly assume that the Legislature would think of self-preservation rather than the protection of foreign governments. When, therefore, in these sections it used the words " organized government " it must have referred to all organized government in this country, whether it be that of the city, State or nation. To advocate the destruction of the government of the city of New York, or of the State of New York, or of the United States by force or by unlawful means, such as the mass strike, is a violation of these sections of the Penal Law.

As I understand it, the majority of this court are agreed, *first,* upon the constitutionality of these sections of the Penal Law; *second,* that the sections apply to writings which advocate the destruction of organized government as it exists in this country; *third,* that *The Revolutionary Age,* published by the defendant Gitlow, was a violation of this law, in that it advocated the overthrow of this government by violence, or by unlawful means.

A word now as to this *Revolutionary Age.* What does it advocate? Let it speak for itself. I quote from the original

publication which the defendant Gitlow had printed, for which he paid, which circulated to the extent of 6,000 copies, and for which, on the trial, he accepted full responsibility.

The Left Wing of the Socialist Party broke away from the main body of socialists, because the latter desired to bring about the changes in government by parliamentary methods, too moderate, indeed, for the Left Wing. The Left Wing desired to bring about the social state by revolution, overthrow, violence, and so, in this *Revolutionary Age,* published this manifesto:

" The world is in a crisis. Capitalism, the prevailing system of society, is in the process of disintegration and collapse. Out of its vitals is developing a new social order, the system of Communist Socialism; and the struggle between this new social order and the old is now the fundamental problem of international politics. * * * The forces of production revolt against the fetters Capitalism imposes upon production. The answer of Capitalism is war; the answer of the proletariat is the Social Revolution and Socialism. * * * The class struggle is the heart of Socialism. * * * But the dominant Socialism accepted the war as a war. for democracy—as if democracy under the conditions of Imperialism is not directly counter-revolutionary! It justified the war as a war for national independence—as if Imperialism is not necessarily determined upon annihilating the independence of nations! * * * The dominant Socialism expressed this unity, developing a policy of legislative reforms and State Capitalism, making the revolutionary class struggle a parliamentary process. This development meant, obviously, the abandonment of fundamental Socialism. It means working on the basis of the bourgeois parliamentary state, instead of the struggle to destroy that state. * * * The proletariat was urged *not* to make a revolution. The dominant Socialism united with the capitalist governments to prevent a revolution. The Russian Revolution was the first act of the proletariat against the war and Imperial-

ism  *  *  *.   But the proletariat, urging on the poorer peasantry, conquered power.   It accomplished a proletariat revolution by means of the Bolshevik policy of ' all power to the Soviets,'—  *  *  *  Revolutionary socialism, on the contrary, insists that the democratic parliamentary state can never be the basis for the introduction of Socialism; that it is necessary to destroy the parliamentary state, and construct a new state of the organized producers, which will deprive the bourgeoisie of political power, and function as a revolutionary dictatorship of the proletariat.   *  *  *   Revolutionary Socialism alone is capable of mobilizing the proletariat for Socialism, for the conquest of the power of the state, by means of revolutionary mass action and proletarian dictatorship.   *  *  *   Revolutionary industrial unionism was a recognition  *  *  *   that the political state should be destroyed and a new proletarian state of the organized producers constructed in order to realize Socialism.   *  *  *   This is not the moment of revolution, but it is the moment of revolutionary struggle.   *  *  *   Strikes are developing which verge on revolutionary action, and in which the suggestion of proletarian dictatorship is apparent, the striker-workers trying to usurp functions of municipal government, as in Seattle and Winnipeg.   The mass struggle of the proletariat is coming into being.   *  *  *   These strikes will constitute the determining feature of proletarian action in the days to come.   Revolutionary Socialism must use these mass industrial revolts to broaden the strike, to make it general and militant; use the strike for political objectives, and, finally, develop the mass political strike against Capitalism and the state.   *  *  *   The mass strikes of the American proletariat provides the material basis out of which to develop the concepts and action of revolutionary Socialism.   *  *  *   The class struggle is a political struggle.   *  *  *   The direct objective is the conquest by the proletariat of the power of the state.   *  *  *   Revolutionary Socialism, accordingly, proposes to

conquer the power of the state. * * * It is accomplished, not by the legislative representatives of the proletariat, but by the mass power of the proletariat in action. The supreme power of the proletariat inheres in the political mass strike, in using the industrial mass power of the proletariat for political objectives. * * * Actually the forms of the new society are constructed under the protection of a revolutionary proletarian government. * * * The revolution starts with strikes of protest, developing into mass political strikes and then into revolutionary mass action for the conquest of the power of the state. * * * The final objective of mass action is the conquest of the power of the state, the annihilation of the bourgeois parliamentary state and the introduction of the transition proletarian state, functioning as a revolutionary dictatorship of the proletariat. * * * The revolutionary proletariat must, accordingly, destroy this state. * * * The old machinery of the state cannot be used by the revolutionary proletariat. It must be destroyed."

It will be seen from the above excerpts that this defendant through the manifesto of the Left Wing advocated the destruction of the State and the establishment of the dictatorship of the proletariat. The way in which this is to be accomplished is by the use of the mass strike; the strike workers attempting to usurp the functions of municipal government as in Seattle and Winnipeg. The strikes advocated by the defendant were not for any labor purposes or to bring about the betterment of the working man, but solely for political purposes to destroy the State or to seize State power. Mass strike means the striking or the ceasing to work by concerted action of, and among, all working classes. Thus government and the functions of government are paralyzed and come to an end.

Section 580 of the Penal Law provides that where two or more persons conspire to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the.

perversion or the obstruction of justice or of the due adminis-
tration of the laws, each of them is guilty of a misdemeanor.
To advocate, therefore, the commission of this conspiracy or
action by mass strike, whereby government is crippled, the
administration of justice paralyzed, and the health, morals, and
welfare of a community endangered, and this for the purpose
of bringing about a revolution in the State, is to advocate the
overthrow of organized government by unlawful means.

I think a reading of this *Revolutionary Age* published by
the defendant justifies the conclusion of the jurors and of the
court below that the defendant was guilty of the crime charged.
To this proposition I understand the majority of this court
assents.

It is suggested, however, that error was committed in the
admission of evidence which requires a reversal of the judg-
ment.   Although I recognize that the sentence may have been
heavy for the offense, yet I cannot see wherein any error has
been committed.

The article published advocates the mass strike.   There is no
description of the mass strike.   We give to these words the
meaning which from experience we know them to have.   The
courts cannot be blind to or profess ignorance of the things
which have recently happened in the world.   Mass strike means
the combined strike of all workers in every field of activity or
enough of them to accomplish the purpose in view.   The mass
strike in this article is advocated for the purpose of the political
overthrow of the government.   It has been accomplished or
attempted in particular cities.   The article itself says so.
" Strikes," so the manifesto reads, " are developing which verge
on revolutionary action, and in which the suggestion of prole-
tarian dictatorship is apparent, the striker-workers trying to
usurp functions of municipal government, as in Seattle and
Winnipeg."

The manifesto advocates the revolution by strikes.   The pro-

letariat dictatorship, it says, is apparent because the striker-workers are trying to usurp functions of municipal government. The strikes which the defendant and the manifesto meant and have reference to are the kind of strikes which happened in Seattle and in Winnipeg. This article plainly states that the defendant and his Left Wing are to bring about the proletariat dictatorship by the mass strike which is the kind of strike that was had in Seattle and Winnipeg.

The People in this case, through Major Furry Ferguson Montague, showed what kind of a strike Winnipeg had. He testified that employees in the various departments of activity refused to work. These consisted of the postmen, teamsters, cooks, waiters, clerks, metal workers, garbage collectors, employees in water and electric light supplies, elevator operators, telephone employees. This witness merely stated what happened in Winnipeg. The effect upon Winnipeg and the people of Winnipeg by reason of this mass strike was excluded. The witness was strictly confined by the learned trial justice to the mere statement that the employees in the various departments went on a strike. This defendant and his Left Wing advocated in the manifesto the overthrow of this government by strikes such as were had in Winnipeg.

Why could not this evidence be introduced? Suppose the manifesto had advocated the ending of President Harding's administration by the same means that ended Garfield's, would not the court take judicial notice of Garfield's assassination, or would the rules of evidence prevent proof that Garfield was shot? The Left Wing Socialists proposed the destruction of this government and the seizure of State power by means of the mass strike. Such a strike, it is written, has happened in Winnipeg. I, for one, cannot see wherein it is incompetent to show what happened in Winnipeg. In fact, so notorious was the strike and suffering in Winnipeg that the court would be justified in taking judicial notice of it. The press was full of

it at the time.    What the world generally knows a court of justice may be assumed to know.

This manifesto refers to the Soviet government in Russia. If it advocated the overthrow of this government and the establishment by force of the Soviet government, would it be incompetent for a court of justice to listen to evidence as to the nature of the Soviet government?    Cannot the meaning of Soviet government be shown as well as the meaning of any other word used?    It is said that this evidence of the Winnipeg strike was very harmful to the defendant.    How can that be harmful which he himself has advocated?    His paper advocated the overthrow of the government by a mass strike.    The evidence of Major Montague showed what a mass strike was.    The defendant used words which have a definite meaning and then seeks to escape the consequences when courts give the words the meaning he intends.

But does he seek to escape the meaning?    His brief in this court would indicate the contrary.    He or his counsel sees in the Winnipeg incident the beneficence of the proletariat dictatorship.

I quote from his brief:    " ' On the side of the manifesto,' in spite of inept choice of verbs, the significance given to the Winnipeg strike, was that it represented a new tendency, in that the striker-workers organized themselves in a way to sustain the municipal life as against serious consequences of the residents of the city.    The point of the reference is the city-wide organization of the workers—the germ of future ' proletarian dictatorship,' or general working-class government—and the use of this organization to carry on social services."

It will be seen from these words that the defendant claims that the manifesto itself showed how the workers of Winnipeg sustained municipal life and that the proletariat government was really a good thing.

Under these circumstances and with this claim the admis-

sion of the mere statement that at Winnipeg the workmen in various departments went out, was not only competent, but even if incompetent, not harmful. The reference of the trial judge in his charge to the Winnipeg strike followed by the question, " Was that a violation of law ?" did not amount to error. That the court had reference to such a strike occurring New York State being unlawful is apparent from the references following to our law of conspiracy.

As the majority of this court are of the opinion that the defendant was guilty of the crime charged, and as I personally cannot see any error in the admission of the evidence regarding the Winnipeg strike, I am of the opinion that the judgment of conviction should be affirmed.

HISCOCK, Ch. J. The defendant has been convicted of the crime of criminal anarchy under a statute adopted by the Legislature of this State in 1902 dealing with that subject. This conviction was substantially based upon his conceded part and activity in causing the publication and circulation in 1919 of a paper called *The Revolutionary Age* in which was set forth at great length what was called " The Left Wing Manifesto " and in and by which it was claimed and has been found that the defendant advocated the overthrow of our government by force, violence and unlawful means. On his conviction he was sentenced to a long term of imprisonment. We, of course, have no jurisdiction or power to consider the question whether the sentence was a judicious one but must consider simply the question whether the evidence did justify defendant's conviction under the statute as it is presented by exceptions surviving the unanimous affirmance, and whether his trial was affected by any substantial error. We shall take up first the manifesto which he helped to publish and circulate and then consider whether it brings him within the prohibition and penalties of the statute which are invoked against him.

As would be expected the introduction and basis of the manifesto is a denunciation of capitalism and its alleged vicious, terroristic and imperialistic tendencies and from whose " last excesses " humanity can only be saved by the " Communist Revolution." It is said that " Now it is the revolutionary proletariat in action that dominates  *  *  *  calling upon the proletariat of all nations to prepare for the final struggle against Capitalism." While the term " proletariat " frequently used is not expressly defined in the manifesto it undoubtedly has its usual meaning of the class of unskilled laborers, without property or capital engaged in the lower grades of work. As throwing much light on the remedies for alleged existing evils which it proposes, the manifesto condemns vigorously and at length those who have advocated another form of remedy. It denounces the representatives of moderate socialism because they united with the governments during the war, abandoned the " class struggle," accepted the " bourgeois state " as the basis of activity which " meant working on the basis of the bourgeois parliamentary state instead of the struggle to destroy that state " and their goal became " the co-operation of classes  *  *  *  instead of emphasizing  *  *  *  that the construction of the Socialist system is the task of the revolutionary proletariat alone " based on " tactics in accord with revolutionary fundaments." It is said that this Socialist Party " developed into an expression of the unions of the aristocracy of labor—of the A. F. L." (American Federation of Labor).

Then in contrast to recognized and constitutional methods of remedy thus condemned and in sequence of thought if not of topical arrangement, the manifesto baldly and boldly proposes and advocates as the remedy for supposed ills the destruction of the State by which is manifestly meant our government. This thought is so definitely and repeatedly expressed that it is unnecessary to occupy much space in emphasizing its presence. But amongst other expressions of it may be quoted the

following: " The old machinery of the State cannot be used by the revolutionary proletariat. It must be destroyed." " Revolutionary Socialism * * * insists * * *. that it is necessary to destroy the parliamentary State." " Revolutionary Socialism accordingly proposes to conquer the power of the State." " Industrial unionism * * * recognizes * * * that the proletariat cannot use this State (the ' bourgeois parliamentary State ') to introduce Socialism, but that it must organize a new State." While the manifesto does not define the word " bourgeois " as used by it, the word apparently is intended to have its ordinary meaning of the middle classes who have property, but who do not belong to the class of capitalists especially marked for destruction or to the proletariat which is to come into revolutionary action.

This overthrow and destruction of the State, that is of our organized and recognized government, is to be accomplished by " mass action " and " mass strikes " of the proletariat who for that purpose will effect " mobilization * * * against the bourgeois State and Capitalism." " Conditions of imperialism and of multiplied aggression will necessarily produce proletarian action against Capitalism, strikes are developing which verge on revolutionary action. Revolutionary Socialism must finally develop the mass political strike against Capitalism and the State." " Revolutionary Socialism * * * proposes to conquer the power of the State * * * by means of political action * * * in the revolutionary Marxian sense which does not simply mean parliamentarism, but *the class action of the proletariat in any form having as its objective the conquest of the power of the State.*" " The supreme power of the proletariat inheres in the political mass strikes, in using the industrial power of the proletariat for political objectives. Revolutionary Socialism accordingly recognizes that the supreme form of proletarian political action is the political mass strikes." " These strikes (mass strikes) will constitute the

determining feature of proletarian action in the days to come. Revolutionary Socialism must use these mass industrial revolts to broaden the strike, to make it general and militant; use the strike for political objectives and finally develop the mass political strike against Capitalism and the State." "The struggle of the revolutionary industrial unionism of the proletariat becomes an indispensable phase of revolutionary Socialism."

On the ruins of the State which is thus to be destroyed there is to be erected a " proletarian state functioning as a proletarian dictatorship." " The Revolutionary Socialist maintains that the bourgeois parliamentary state must be completely destroyed and proposes the organization of a new state the dictatorship of the proletariat." " It is, therefore, necessary that the proletariat organize its own state for the coercion and suppression of the bourgeoisie." This dictatorship is not very fully defined but it stands out sufficiently that it embodies the class power of the revolutionary proletariat arising upon the destruction of the State and that it is a " recognition of the necessity for a revolutionary state to coerce and suppress the bourgeoisie " and " the proletariat as a class alone counts."

As further indicating the nature of this dictatorship it is stated that amongst its tasks will be both political and economical expropriation of the bourgeoisie (that is, deprivation of political and property rights), expropriation and nationalization of banks and large organizations of capital, it being significantly added that " expropriation proceeds without compensation."

But this dictatorship is only a temporary instrument, a " transition " state, whose task it is " to render itself unnecessary." " Together with the government of the proletarian dictatorship there is developed a ' new government ' which is *no longer government in the old sense* since it concerns itself with the management of production and not with the govern-

ment of persons. Out of workers' control of industry introduced by the proletariat dictatorship, there develops the complete structure of Communist Socialism—industrial self-government of the communistically organized producers. When this structure is completed   *   *   *   the dictatorship of the proletariat ends, in its place coming the full and free social and individual autonomy of the Communist order." This is the ultimate consummation for which " The Communist International calls the proletariat of the world to the final struggle."

In the course of the manifesto it was said that strikes were developing which verged on revolutionary action and in which the suggestion of proletarian dictatorship is apparent, the striker-workers trying to usurp functions of municipal government as at Seattle and Winnipeg and that " the mass struggle of the proletariat is coming into being." Because of this reference to the Winnipeg strike the court permitted evidence to be given showing that various classes of employees by concerted action struck, prevented the organized and lawful government from functioning and that a committee of the strikers took charge of and conducted the affairs of the city with results some of which in a general way were described.

As we read this manifesto interspersed with sentiments and statements such as we have quoted we feel entirely clear that the jury were justified in rejecting the view that it was a mere academic and harmless discussion of the advantages of communism and advanced socialism and a mere Utopian portrayal of the blessings which would flow from the establishment of those conditions. We think on the other hand that the jury were entirely justified in regarding it as a justification and advocacy of action by one class which would destroy the rights of all other classes and overthrow the State itself by use of revolutionary mass strikes. It is true that there is no advocacy in specific terms of the use of assassination or force or violence. There was no need to be. Some things are so commonly incident

to others that they do not need to be mentioned when the underlying purpose is described. The accompaniments of great strikes have become such a matter of ordinary experience and observation that no specific words were necessary to inform either the readers of this manifesto or the jury which was passing upon it that a revolutionary mass strike conducted by one great class of workers for the purpose of destroying the rights of all other classes and governments itself would not be expected to accomplish its purposes by gentle persuasion and the soft voice of diplomacy, but that conceived in an unlawful conspiracy it would inevitably function with force and violence.

Therefore, assuming that the question is raised by sufficient exceptions, we think the jury was fully justified in finding this defendant, who concededly took part in circulating this proclamation and in impressing it upon the minds of others, guilty of criminal anarchy as defined by statute.

That statute declares that " Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means. The advocacy of such doctrine either by word of mouth or writing is a felony." It then further provides that any one is guilty of a felony who (1) " By word of mouth or writing advocates, advises or teaches the duty, necessity or propriety of overthrowing or overturning organized government by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means, or (2) prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means."

We shall spend no time in discussing the proposition urged

upon us that this statute is unconstitutional because it interferes with that freedom of speech and discussion which is secured by the Constitution.   Every intelligent person recognizes that one of the great rights secured to the citizens of this country is that of free and fearless discussion of public questions including even the merits and shortcomings of our government.   It would be intolerable to think that any attempt could be successfully made to impair such right.   But the difference between such forms of discussion and the advocacy of the destruction of government itself by means which are abhorrent to the entire spirit of our institutions is so great that we deem it entirely unnecessary to support at length the proposition that the legislature of this State may prohibit the latter without infringing the former.

Two propositions, however, are earnestly urged which challenge the correctness of the conduct of the trial of defendant and which merit consideration.

As has already been stated evidence was permitted of a strike which had occurred in Winnipeg some time before the manifesto was issued and which had been the subject of widespread notoriety.   This evidence dealt with the general features of the strike showing how various classes of employees in governmental and public occupations had conspired and combined in a general strike whereby the municipal government was temporarily overthrown and committees of strikers substituted in its place.   We doubt if this evidence added much to the inferences which could be fairly drawn from the manifesto itself. But we think that it was competent.

The manifesto stated: " Strikes are developing which verge on revolutionary action, and in which the suggestion of proletarian dictatorship is apparent, the striker-workers trying to usurp functions of government as in Seattle and Winnipeg. The mass struggle of the proletariat is coming into being." The meaning of the terms " mass struggles " and " mass strikes " as used in the manifesto might not in every respect

be self-explanatory and free from doubtful meaning. When the manifesto referring to the Winnipeg strike stated that strikes were developing in which the suggestion of a proletariat dictatorship was apparent and that the mass struggle of the proletariat was coming into being, we think that it referred to and accepted the Winnipeg strike as an illustration of what a proletariat dictatorship would mean and as somewhat a definition of what was meant by mass struggle and that, therefore, evidence of these occurrences was competent for the purpose of showing what was meant by the author of this manifesto and what would be understood by those who read it.

· The second proposition which is urged upon our consideration is the one that the statute under which the defendant was convicted is aimed at the attempt completely and permanently to destroy and overthrow organized government and that it does not include an attempt at mere revolution whereby there is to be substituted for an existing form of organized government another and different form which would still possess the attributes of organized government. While it doubtless would be something of a shock to citizens of this State to be told that persons born in other countries and saturated with anarchistic and revolutionary notions might come into this State and advocate the overthrow by force of our present government without being liable under the statute in question provided only they suggested some dictatorship or other form of class and unrepresentative government which possessed some semblance of organization, we shall assume merely for the purpose of this discussion that that is the meaning of the present statute. Other states have adopted statutes broader than the present one and under which attempts at sedition and revolution would be clearly punishable. If our government was not in like manner protected from such attacks, it was a defect in legislation which could be remedied. However, giving to the defendant the benefit of the distinction which he urges between an attempt wholly

to overthrow and end organized government and an attempt by revolution to substitute one form of government in the place of another, we still think that he was properly convicted and his exceptions unavailing, because he was not advocating in the place of our existing government a condition which could be fairly regarded as an organized government. We think that there was no evidence upon which a jury could be permitted to find that the doctrine which he was advocating proposed the substitution of any real government in the place of that now existing. His manifesto urges that one class shall take possession of all power to the political and economic destruction of other classes and of the State; that there shall be organized a class dictatorship but that this shall only be a temporary instrument and expedient leading to the development of " a new government which is no longer government in the old sense, since it concerns itself with the management of production and not with the government of persons. Out of workers' control of industry introduced by the proletariat dictatorship, there develops the complete structure of Communist Socialism—industrial self-government of the communistically organized producers. When this structure is completed    *    *    *    the dictatorship of the proletariat ends, in its place coming the full and free social and individual autonomy of the Communist order." This may, and to many people doubtless will, sound utterly visionary and foolish. Nevertheless it is the final goal to which this defendant and his manifesto were urging action and in our judgment it is a condition which would possess none of the attributes of organized government and which furnishes no basis for the suggestion that here was a mere attempt to substitute one form of government for another.

The Legislature which adopted this statute was sitting in the State of New York and especially legislating for the people of that State and in protection of the government of that State. Whether they were fully acquainted or not with the historical

and technical definitions of communism, anarchy and organized government, we must assume that they had a practical knowledge of what constitutes organized government according to the prevalent notions of the people for whom they were legislating. So we assume that by organized government they contemplated and had in mind at least a government of fixed powers and jurisdiction, functioning along stable and well-defined lines, regardful of the fundamental rights of life, liberty and property, and having the will and the power under ordinary conditions to compel persons to observe. those rights and obey its commands.

It is unnecessary to hold that " organized government " within the meaning of the statute would only exist when it possessed all of these attributes. It is sufficient for the purposes of this case to say that the final condition to which defendant was attempting to lead possessed none of them. In the words of the manifesto itself there was to be " developed a *new government which is no longer government in the old sense* " and in which, if it ever could be realized, self-regulation and chaos would take the place of real government and order.

In my opinion the judgment should be affirmed.


POUND, J. (dissenting). The basic question is whether sections 160 to 166 of the Penal Law, defining criminal anarchy and prohibiting the advocacy thereof, are applicable to the doctrines of the Left Wing of the Socialist party, the communist or revolutionary socialists, as set forth in the manifesto, program or platform issued by the National Left Wing Council and published in *The Revolutionary Age* of July 5, 1919. Revolution for the purpose of overthrowing the present form and the established political system of the United States government by direct means rather than by constitutional means is therein clearly advocated and defended without apology or

excuse. Revolution, politically speaking, is a crime against the State, however defensible its purpose may seem to its advocates. Fundamentally a State may, by the exercise of the right of self-preservation, and particularly when at war, protect itself by prohibiting the teaching of revolutionary doctrines. This has been done by the United States (U. S. Espionage and Sedition Act of 1918) and by many states which have adopted sedition statutes punishing things said and done which do not amount to treason, for want of an overt act, but which are treasonable in teaching and tendency. (See list of State War and Peace Statutes affecting freedom of speech. Chaffee on Freedom of Speech, pp. 399 *et seq.*) Revolution may aim to change the form of government, as from a kingdom to a republic, with few radical changes except in the method of choosing public officials. Anarchism, however, means to its philosophic advocates like Tolstoi and Kropotkin, not positive disorder, but the absence of any capable supreme power in the State, whether a king or the representative chosen by the people. The means by which this end may be reached are (a) constitutional methods, (b) methods of force and violence or other unlawful means. Anarchy's means of bringing in the anarchistic state, the social order based upon liberty unrestricted by law, are so commonly associated with assassination of public officials and other forms of terrorism that lawful anarchism is regarded as an ideal, a dream or hope, a negligible philosophic abstraction, not calling for any form of action. " The importance of the anarchistic movement was not great in the past, nor does it now play any important part in the revolutionary or seditious movement in this country. Its practical influence upon the affairs of government is limited, being confined, principally, to political assassination, such as the murder of King Humbert of Italy in 1900, and President McKinley at Buffalo in 1901." (Report of Lusk Committee to investigate seditious activities, vol. 1, pp. 842, 843.) The

common definition of an anarchist is: "One who seeks to overturn by violence all constitutional forms and institutions of society and government with no purpose of establishing any other system of order." (Cent. Dict.)

In 1902 the State of New York adopted the statute under consideration with this definition in mind. The assassination of President McKinley in 1901 had brought forcibly to the attention of the Legislature that the publication of articles instigating revolution by the murder of public officials was punishable, if at all, only as a misdemeanor, as an act endangering the public peace, under the catch-all provisions of section 675 of the Penal Code (Penal Law, § 43), which includes acts for which no punishment is expressly prescribed. (People v. Most, 171 N. Y. 423.) To nip in the bud the growth of anarchistic theories and to lessen the possibility of future anarchistic acts or attempts by those whose minds had been excited or poisoned by such publications, the teaching or advocacy of anarchy as then generally understood was made criminal. The advocacy of revolution against organized government abroad— e.g., by the people of Germany against the Kaiser's government, or by the people of Ireland against the British government—was not the evil contemplated, nor was the advocacy of other seditious activities against the State or the United States so present a danger as to be seriously regarded. Although the Left Wing seeks ultimately the end of organized government and the establishment of the communistic society which is the anarchistic state, this transition is to be achieved by evolution through "the revolutionary dictatorship of the proletariat," as advocated by Marx in the middle of the nineteenth century. To discuss or defend the legality of the means proposed for the accomplishment of this immediate end is an idle task. Such means, even though force and violence are disavowed, are not lawful, for the reason that the form of our government may be lawfully changed only by the vote of the majority of the peo-

ple, expressed through the ballot by constitutional methods and that method of change is not the method advocated by the manifesto. The orderly constitutional processes of moderate socialism are therein derided as weak and ineffectual. To compel the government to cease to function by means of the mass strike, to set up the proletariat dictatorship and to expropriate private property, is the pretentious and vicious program glibly advocated. But the question, in clear terms, is not whether this is the doctrine of sedition, criminal conspiracy and rebellion against our form of government, but whether this is the doctrine of criminal anarchy.

This case was tried on the theory that the People had only to establish (1) the existence of a government which was organized and (2) that defendant advocated that such government be overthrown by unlawful means. Proper exceptions were taken to raise the point that advocacy of revolution merely was improperly considered as advocacy of anarchy and that a purpose to destroy all forms of government and to establish life without government must also be shown.

The United States and the states have a highly organized government, the principles of which are, representative constitutional government, divided between the nation and the states, with three separate departments of political power and proper guaranties of the fundamental rights of life, liberty and property. But organized government need not be representative government or constitutional government. The Czar of Russia, the Mikado of Japan, the Sultan of Turkey and the Shah of Persia, like other despots, had organized governments with absolute power over their subjects. The despotism of the mob may be as well organized and as little regardful of personal rights as it was in the Reign of Terror of the French Revolution. *Organized government is the political power in the state whose commands the community is bound to obey and is the antithesis of government without such political power*

*which is the unorganized or anarchistic state.* Anarchism aims directly to establish such a state by the overthrow of organized government. Left Wing socialism aims first to change the form of government and by unlawful means to substitute therefor another form of organized government, *i.e.*, the dictatorship of the proletariat. This dictatorship is conceived to be an organized government which rules with an iron hand, for it does not aim to rest for its security on the consent of the governed. An attempt to set up such a government is unlawful, but I find nothing in our statute which makes it a crime to teach such revolutionary doctrines and advocate such a change in our form of government, except as such teaching amounts to a breach of the peace as in the Most case (supra).

The error of the trial judge was prejudicial to defendant. The advocate of the proletarian class rule, while advocating a vicious doctrine subversive to our institutions and menacing the orderly rule of law, is advocating, not anarchy, but something entirely different. The setting up of the dictatorship of the proletariat would be a far-reaching change in the form of government; but it would not be the destruction of all organized government. The statute is aimed historically only at advocacy of the latter doctrine. Although the defendant may be the worst of men; although Left Wing socialism is a menace to organized government; the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected. Defendant has been convicted for advocating the establishment of the dictatorship of the proletariat and not for advocating criminal anarchy.

The judgment should be reversed and a new trial ordered.

HOGAN, McLAUGHLIN and ANDREWS, JJ., concur with CRANE, J.; HISCOCK, Ch. J., concurs in opinion, in which also HOGAN, McLAUGHLIN and ANDREWS, JJ., concur; POUND, J., reads dissenting opinion, in which CARDOZO, J., concurs.

Judgment of conviction affirmed.