## 47191. WILLIAMS v. THE STATE.

Clark, Judge. "Chutzpah"[1] is the appropriate word to describe the crime upon which appellant was tried: burglary by breaking into the Jenkins County Courthouse

---

[1]Sometimes spelled "hutzpa" this expressive Yiddish word appears in modern English Dictionaries as meaning "colos-

and asportation therefrom of 8 pistols, 5 shotguns, and rifle shells which were in three locked cabinets in the sheriff's office to be used as evidence in another case with which accused had no connection.

Did the accused who was found guilty at the second trial (the first having ended in a mistrial) and sentenced to 10 years commit this crime?

"Yes," says the eloquent district attorney emphasizing certain actions of the accused which were sufficient to convince the jury because they should be considered incriminating circumstances. "No," says the able defense counsel who moved for an acquittal and new trial because the key element in the web of circumstantial evidence—possession of the stolen items—was missing.

The State's evidence showed that on December 2, 1970, between 5 p.m. and 3:45 of the following morning a forcible entry was made into the courthouse at Millen through a window being jimmied in the tax collector's office followed by the thief breaking into the sheriff's office through use of a metal bar forcing the lock and then using the same means to force open the padlocks on three cabinets from which were removed pistols, rifles, cartridges and shells which had been stored as evidence in another case. G.B.I. Agent Johnny C. McGlamary testified concerning the absence of fingerprints and his interview with the accused shortly after the accused was jailed with no incriminating evidence being developed during the interview.

Millen Police Officer Johnny Beard testified he was making his nightly motor patrol when at approximately 1:30 a.m. he saw a 1945 Comet automobile parked at a location near heavy underbrush and where there was no house.

---

sal effrontery" or "brazen gall" but as stated in *The Joys of Yiddish* by Leo Rosten, "The classic definition of 'chutzpah' is that quality enshrined in a man, who having killed his mother and father, throws himself upon the mercy of the court because he is an orphan."

His examination of this vehicle showed it was locked with clothes inside and that the motor was still hot showing it had recently been operated. Becoming suspicious he stationed himself some distance away on College Street without lights on his own vehicle to keep the suspicious automobile under surveillance. At approximately 3:45 a.m. he saw the accused walking from the courthouse to the parked automobile which he entered and in which he sat approximately two minutes before starting the motor. The accused drove without illumination of his headlights until after he had made a u-turn and proceeded some distance west. Officer Beard permitted him to proceed a half block and then without turning on his police vehicle's lights followed the suspicious car. During this shadowing he saw the driver pull over to the left-hand curb near the corner of College and Masonic Streets, get out of his automobile, leave the door open and absent himself for approximately one minute.

Upon returning to the automobile the accused continued to be followed by the officer until "he stopped the vehicle, got out and walked approximately six to eight feet from the roadway across the sidewalk approximately four to five feet onto the lawn" of the courthouse. The officer having stopped his car was able by illumination from a street light to observe the accused bending but apparently this movement was not completed as "he straightened back up, turned around and walked back across the lawn, across the sidewalk and got in his vehicle." Thereupon the vehicle took off at a fast rate of speed with the police car giving chase but without disclosing it to be a law enforcement vehicle until the point when the red light was turned on at which time the accused stopped. This is described as being "where Mr. Ernest Thorn, Jr.'s house is." Meanwhile Officer Beard had radioed the Police Department so Chief of Police Cleveland Johnson and Officer Melton Ronnie Gay were en route. Upon the car being stopped it developed the right rear tire was getting flat. After the three police officers had

queried the accused and were satisfied he was legitimate they directed him to a service station at which he could obtain air for his tire. No arrest was made at this time as there was no knowledge of the sheriff's office having been burglarized.

Officer Beard returned to the courthouse lawn and there discovered "several shotguns and rifles tied up in a T-shirt" at the identical spot where he had observed the accused to have been "bending over." Reporting this find to the Police Chief the three officers proceeded to the service station and arrested Williams.

There was an interval of five to six minutes between the original observation of the accused "stooped over" on the courthouse lawn and the discovery of the stolen items by the officer who acknowledged that he could not swear the guns were on the ground at that spot when previously he had seen the accused bending over.

Two witnesses for the State, Chief Cleveland Johnson and Policeman Melton Ronnie Gay, confirmed that portion of the testimony of Officer Beard with which they were connected but added nothing with reference to possession. Important testimony came from Sheriff Wilmer Taylor by relating the manner in which the burglary was committed, the extent of the theft, and identification of the stolen items. In connection with the essential element of possession, he testified as to finding the pistols and an empty shell box next morning (at least five hours later) at the two locations at which the accused had made stops while being followed by Officer Beard.

Defendant testified under oath and related he had left Augusta that night after becoming angered during an argument with his wife, taking his hospital orderly uniform with him for use the next day and had driven to his former home in Millen with the intention of seeing his mother. When he saw no lights in the residence of his parents, he reconsidered the consequences of his marital spat, and then drove to see his brother who lived on

Lovers' Hill[2] but upon further thought did not stop there. He also related other events of the evening with some denials of inconsequential portions of the State's witnesses but with nothing being testified to by him with reference to possession or the burglary which would implicate him.

Does the evidence in this case satisfy those standards[3] which Anglo-Saxon jurisprudence established to protect the innocent? There were no eyewitnesses to the burglary. Defendant made no admissions that connected him with the incident. No fingerprints were found. Suspicious actions are shown but without proof that defendant had possession of the stolen items the State's case fails.

Mere presence of one where a crime is committed, without more, will not support a conviction. *Sweat v. State,* 119 Ga. App. 646 (168 SE2d 654). The police officer who observed defendant "bending over" in the illumination of the street light would not swear that the contraband was on the courthouse lawn at that time, so there was "equal opportunity" for others to commit the offense. The late Judge Townsend in *Harper v. State,* 85 Ga. App. 252, 255 (69 SE2d 102), lists nine citations on this subject in holding that even the presumption of law that whiskey found in the home belongs to the head of the house is not sufficient to support a verdict of guilty, where the defendant's occupancy of the premises is maintained by him and his family jointly. See also *Brown v. State,* 94 Ga. App. 542

---

[2]The writer of this opinion must acknowledge his use of names of the individuals and locations involved in this case brought memories of Martin Chuzzlewit, Uriah Heep, Scrooge, Jarndyce, Barkis, et al., fictional creations of Charles Dickens.

[3]"Although the defendant may be the worst of men, the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected," said Judges Pound and Cardozo in their famous dissent in People v. Gitlow, 234 N. Y. 132 (136 NE 317).

(95 SE2d 302) where this "equal opportunity" situation brought a reversal in view of the necessity of satisfying *Code* § 38-109 that "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

This doctrine of "equal opportunity" applies with greater force to the discovery five or six hours afterwards of missing items in the yards of other individuals, even though it must be acknowledged to be extremely coincidental.

It has been held that mere presence at the scene of a crime or where criminal acts are committed, even when coupled with flight, is insufficient to authorize conviction. *Benjamin v. State,* 16 Ga. App. 376 (85 SE 349); *Burchfield v. State,* 40 Ga. App. 506 (150 SE 459). "Neither presence, nor flight, nor both together without more, is conclusive of guilt." *Griffin v. State,* 2 Ga. App. 534 (58 SE 781). Where there are only unexplained and suspicious circumstances, they are not sufficient to convict the defendant. *Rodgers v. State,* 213 Ga. 797, 803 (102 SE2d 10); *Mach v. State,* 109 Ga. App. 154, 161 (135 SE2d 467); *Hodges v. State,* 103 Ga. App. 284 (118 SE2d 858).

The district attorney contends the facts as developed bring the case within the ambit of *Williams v. State,* 81 Ga. App. 748 (59 SE2d 743) so that the matter is one for jury determination. This is not in accord with the principle stated in *Harrison v. State,* 83 Ga. 129, 135 (9 SE 542) that "Where presence is necessary to constitute guilt, it seems that a reasonable doubt of presence would, by irresistible logic, involve reasonable doubt of guilt" which was approved in *Young v. State,* 225 Ga. 255, 258 (167 SE2d 586). The facts of the case are similar to those in *Poythress v. State,* 67 Ga. App. 324 (20 SE2d 212) where the defendant, who had twice been convicted on illegal whiskey charges, was apprehended as he was approaching a still a mile away from his home, this court

there reversing a conviction.

In Scotland[4] the jury is given a choice of three verdicts, "Guilty," "Not Guilty," and "Not Proven Guilty." In Georgia the accused enters upon his defense with the presumption of innocence which remains with him throughout the trial in the nature of evidence in his behalf until it is met and overcome by that superior weight of evidence on the part of the State sufficient to satisfy the mind and conscience beyond a reasonable doubt (*Code* § 38-110). A further requirement in a case like that sub judice, dependent entirely upon circumstantial evidence, is the exclusion of every other reasonable hypothesis save that of guilt of the accused. *Code* § 38-109. Despite the apparently incriminating circumstantial evidence which resulted in a conviction this exclusion has not occurred. See *Johnson v. State,* No. 47175, decided by this court on May 8, 1972. We find that here the "Not Proven Guilty" verdict would have been appropriate and therefore the case is

*Reversed. Eberhardt, P. J., and Deen, J., concur.*
ARGUED MAY 8, 1972—DECIDED MAY 23, 1972.

*O. L. Collins,* for appellant.
*J. Lane Johnston, District Attorney,* for appellee.

---

[4]As this opinion began with a Hebrew word and ends on a reference to Scotland, it should be noted this is not inappropriate because many historians have traced the Scythians or Scuthae, who populated Scotland, to be descendants of the Ten Lost Tribes of Israel. *Time* magazine issue of August 31, 1953; "The Ten Lost Tribes—Facts and Fictions"—H. Sol Clark, LX *The New Age* 621.