## Roger Murray v. J & B International Trucks, Inc., International Harvester Credit Corporation and North Country Motors, Inc.

[508 A.2d 1351]

No. 83-362

Present: **Allen, C.J., Hill, Peck and Hayes, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed January 3, 1986

*Richard A. Axelrod* and *Steven A. Adler* (On the Brief) of *Gensburg & Axelrod*, St. Johnsbury, for Plaintiff-Appellee.

*James M. Farrell* and *Thomas F. Heilmann* (Oral Argument), Burlington, for Defendant-Appellant J & B International Trucks, Inc.

*McNamara & Fitzpatrick, Inc.*, Burlington, for Defendant-Appellant International Harvester Credit Corp.

**Hayes, J.** This is an appeal by three defendants, International Harvester Credit Corporation (IHCC), J & B International Trucks, Inc. (J & B), and North Country Motors, Inc. (North Country), from a judgment against them in favor of plaintiff-appellee, Roger Murray. The questions on appeal relate to the trial court's award of damages for wrongful repossession and conversion of a truck that plaintiff purchased from J & B.

The facts are long and complicated. In the summer of 1979, plaintiff was in the business of trucking wood to mills. As part of his business, he owned a 1968 truck, a body attached to the truck to haul logs, a loader to lift logs, and a tag axle placed under the truck body to support extra weight. In July of that year, plaintiff

signed an order to purchase a new 1979 International truck from J & B. The purchase order provided that plaintiff would trade in his 1968 truck, and that the loader, body, and tag axle from the old truck would be attached to the new truck.

When he signed the purchase order, plaintiff estimated to William Cleary, the J & B salesman, that he owed a balance of $7,500.00 on his truck to New England Merchants Bank (NEMB) and about $2,300.00 to Orleans County Community Services Association (OCCSA). Actually, the 1968 truck was subject to a security interest in favor of NEMB for $7,037.29. Plaintiff also owed $2,820.42 to OCCSA in connection with his logging equipment. Plaintiff told the salesman that he could not afford payments of more than $1,200.00 per month. Plaintiff, however, agreed to make a payment of $1,381.43 each month on the new truck for the first sixteen months. After that time, the payments were to drop to $1,208.75 per month.

Plaintiff was given a trade-in allowance of $1,475.00, based on his estimate that he owed $7,500.00 to NEMB on the 1968 truck which had a value of $8,975.00. Plaintiff's trade-in allowance was increased to $1,937.71 when the bank debt was found to be $462.71 less than he had estimated. Plaintiff, however, received no benefit because J & B raised the cash price set forth in the retail installment contract from $42,630.00 to $43,092.71.

On August 2, plaintiff delivered his trade-in truck to J & B so that the truck body, log loader, and tag axle could be removed from it and installed on the new vehicle. After some delay, J & B delivered the new truck to plaintiff on August 22, 1979. On his way home, plaintiff experienced transmission difficulties, and he returned the new truck to J & B the next day. J & B replaced the defective transmission. On August 30, plaintiff again picked up the truck.

The next day, plaintiff hauled his first load of wood using the new truck. After a second pick up, while heading toward a Canadian mill, the engine seized. Plaintiff called J & B, who arranged to have the truck towed to a garage at North Country Motors, an International Harvester Company dealer in Newport, Vermont. North Country determined that a defective bearing had caused the engine failure. It began to repair the engine, without charge, in accordance with the limited warranty, and completed the work on September 20, 1979.

While the truck was at North Country, IHCC, to whom plaintiff's contract had been assigned, discovered that it had mistakenly calculated the charges to plaintiff by not including a $4,530.00 physical damage insurance expense figure in its computations. An IHCC employee called North Country and instructed it to hold onto the truck and not deliver it to plaintiff. A finance sales supervisor from IHCC wrote to plaintiff indicating that, because of the mistake, his monthly payments would have to increase to $1,491.62 or $110.19 per month more than he had agreed to. Alternatively, plaintiff was offered the option of keeping the payments at the same level, but providing his own insurance. Plaintiff was informed that he would either have to sign a new contract at the higher monthly rate or provide proof of insurance before he could remove his vehicle from North Country Motors. Plaintiff could not obtain physical damage insurance coverage elsewhere at a comparable rate, and he could not afford to increase his payments by $110.19 per month.

William Cleary, the salesman from J & B who had sold the new truck to plaintiff, asked plaintiff to sign a new contract which reflected the higher payments. Plaintiff declined, and demanded return of his down payment, his truck body, loader, and tag axle.

Counsel for plaintiff wrote to IHCC seeking rescission of the contract. IHCC advised plaintiff that it had corrected the error in the retail installment contract by reducing the cost of insurance from $4,530.00 for four years to $1,370 for one year, and by making other adjustments which reduced the first sixteen monthly payments from $1,381.43 to $1,350.17. The finance charge, however, was increased from $8,572.12 to $11,481.88. Plaintiff decided he could not agree to the proposed changes because it appeared that ultimately he would have to provide his own insurance and he could not afford the total monthly cost.

IHCC advised J & B during September and October that 1) if plaintiff did not agree to a corrected retail installment contract, IHCC would repossess the truck, and 2) if plaintiff did not redeem the truck, IHCC would require J & B to purchase the truck pursuant to a recourse obligation of J & B under its agreement with IHCC.

In February 1980, IHCC sent to J & B the truck's certificate of title and an affidavit of repossession. Soon after, IHCC gave to J & B a bill of sale for the vehicle. J & B then paid plaintiff's indebtedness to OCCSA for $2,820.42 and obtained a release of

OCCSA's lien on the truck. J & B then sold the truck to a third party for $43,000.00. J & B's repurchase obligation to IHCC was for $42,458.46.

Plaintiff subsequently filed suit against J & B, IHCC and North Country alleging conversion, and seeking consequential and punitive damages. J & B filed a counterclaim against plaintiff alleging losses sustained in the truck resale. J & B also filed a crossclaim against IHCC and North Country, alleging that it was entitled to indemnity for any adverse judgment.

The trial court: 1) held that plaintiff was entitled to receive $1,393.00 in consequential damages, plus interest, from defendant J & B for breach of warranty; 2) found all three defendants jointly and severally liable for conversion and awarded plaintiff $20,438.00, plus interest, which represented the value of property converted and lost profits; 3) awarded plaintiff $5,000.00 in punitive damages against IHCC; and 4) awarded J & B $2,820.00, plus interest, on its counterclaim against plaintiff, which represented the amount of plaintiff's indebtedness to OCCSA, but disallowed J & B's claim of indemnity.

## I.

### A.

Appellant IHCC, arguing in support of J & B, asserts that the trial court erred in calculating the counterclaim amount awarded to J & B. The trial court awarded J & B $2,820.00, which represented the amount J & B paid out to release plaintiff's OCCSA loan. J & B, however, claimed its adjusted total loss in connection with the resale of the truck was $5,306.67.

J & B listed as damages not only its repurchase obligation to IHCC ($42,458.46) and the payoff to release the OCCSA loan ($2,820.42), but also amounts for forty gallons of fuel ($38.50), for installation of body, loader, and tag axle ($618.14), for windshield repair ($35.00), for the repair of a leaking hose and to replace broken lights and wires ($182.15), for U.C.C. filings ($4.00), and for a salesman's commission ($2,150.00).

The trial court specifically rejected J & B's claimed losses for the cost of repairs to the truck as without justification. We agree. No evidence existed that, as a result of plaintiff's actions, any repairs were necessary to the windshield, or to a leaking hose or to replace broken lights and wires. Furthermore, the court spe-

cifically found that the cost of installing plaintiff's body, loader, and tag axle onto the new truck had been a part of the new vehicle's purchase price. Plaintiff obviously is not liable for the purchase price of the truck which was wrongfully taken from him by defendants.

The trial court dismissed the damage items of forty gallons of fuel, the cost of U.C.C. filings, and the salesman's commission without a specific discussion. It appears that the fuel was used in driving the truck from Newport to Burlington. The request by defendants J & B and IHCC to recover the cost of fuel used to take plaintiff's truck from him is a classic example of "chutzpah."* The trial court did not err in denying this amount.

Neither did the court err in denying the four-dollar claim for the cost of the U.C.C. filing. The financing statement was filed solely for defendants' benefit. The court did not abuse its discretion in dismissing this claim.

Finally, the trial court did not err in denying the commission for salesman Cleary. Even if the commission were not included in the $43,000.00 sales price, defendant's salesman, who actively participated in the conversion, should not be rewarded. Salesman Cleary originally negotiated the transaction with plaintiff, and he knew what plaintiff could afford to buy. This same salesman subsequently drove to St. Johnsbury to meet plaintiff in an attempt to get plaintiff to sign a new contract. A wrongdoer may not profit from his wrongful acts. The trial court had reasonable grounds for awarding the damages it did, and we find no abuse of discretion here.

## B.

IHCC next argues that the trial court erred in calculating the damage awarded for conversion. The trial court awarded plaintiff $15,238.00, which represented the trade-in allowance on plaintiff's old truck ($1,937.71) and the value of plaintiff's logging equipment which had been attached to the new truck ($13,300.00). IHCC contends that the trial court's inclusion of the value of the logging equipment constituted a double recovery because this

---

* "The classic definition of 'chutzpah' is that quality enshrined in a man, who having killed his mother and father, throws himself upon the mercy of the court because he is an orphan." *Williams* v. *State*, 126 Ga. App. 350, 350-51 n.1, 190 S.E.2d 785, 785 n.1 (1972).

amount was allegedly credited to plaintiff in reducing the value of J & B's counterclaim. We disagree. There was no such double recovery. The trial court correctly computed the counterclaim damages to be solely the amount J & B paid to satisfy plaintiff's outstanding debt to OCCSA.

■ The measure of damages for conversion is generally the value of the thing converted at the time and place of conversion. *Redd Distributing Co.* v. *Bruckner*, 128 Vt. 635, 639, 270 A.2d 580, 583 (1970). In this case, plaintiff had $1,937.71 in equity in the new truck based on the trade-in value of his 1968 truck. Defendants converted not only the new truck, but also plaintiff's truck body, log loader, and tag axle worth $13,300.00 in total. Plaintiff is entitled to recover these amounts from defendants.

## C.

IHCC next asserts that the trial court improperly awarded punitive damages.

■ Punitive damages may be awarded in actions of conversion "if the conversion is characterized by malice, willfulness, or a reckless and wanton disregard of the plaintiff's rights." *Pezzano* v. *Bonneau*, 133 Vt. 88, 90, 329 A.2d 659, 660 (1974) (citing *Gaylord* v. *Hoar*, 122 Vt. 143, 148, 165 A.2d 358 (1960)).

■ In this case, sufficient evidence exists to support the trial court's finding that IHCC acted in reckless disregard of plaintiff's rights. The miscalculation involving insurance on plaintiff's new truck was caused solely by IHCC. Yet this mistake led IHCC to wrongfully take control of plaintiff's truck by notifying North Country to withhold possession from plaintiff. While holding the truck, IHCC attempted to renegotiate the contract, despite the fact that plaintiff had a contract which was not in default. Thus, IHCC recklessly disregarded plaintiff's rights in repossessing the truck, and as a direct result, plaintiff lost his business and his source of income. The bank threatened foreclosure on plaintiff's home. Finally, when he was no longer able to pay his bills, plaintiff lost his credit rating. The evidence is sufficient to support the trial court's conclusion that IHCC acted with reckless disregard of plaintiff's rights. The trial court did not err in its award of punitive damages.

■ None of the defendants raised below or argued on appeal the issue of whether punitive damages are to be assessed accord-

ing to the guilt of the most innocent defendant, and that issue need not be addressed. We will not consider on appeal matters not raised below. *In re J.E.G.*, 144 Vt. 309, 313, 476 A.2d 130, 133 (1984). Issues which are not appealed and briefed are waived. *Hilder* v. *St. Peter*, 144 Vt. 150, 165, 478 A.2d 202, 211 (1984).

## II.

### A.

J & B argues that the trial court erred in finding J & B jointly and severally liable with IHCC and North Country for conversion of plaintiff's logging truck. We disagree.

■ "[F]indings of fact and conclusions of law by the trial court will not be disturbed on appeal unless clearly erroneous when viewed in the light most favorable to the prevailing party." *Finley* v. *Williams*, 142 Vt. 153, 155, 453 A.2d 85, 86 (1982). The trial court stated in its conclusions of law that:

> [a]lthough J & B did not initiate the conversion, it subsequently participated by attempting to negotiate a new contract with plaintiff on behalf of IHCC while IHCC was withholding possession from plaintiff, by driving the truck from Newport to its Burlington place of business, and by eventually selling the truck to a third party.

J & B asserts that the trial court's findings do not support the court's conclusion that J & B "attempted to negotiate a new contract with plaintiff." The trial court, however, found that "William Cleary, the salesman from J & B who had sold the truck to plaintiff, met with plaintiff and asked him to sign a contract reflecting the new higher payments." We believe that this finding, supported by the evidence, adequately bolsters the trial court's conclusion that J & B *attempted* to negotiate a new contract with plaintiff.

J & B also argues that, since the contract had been assigned to IHCC, J & B was without power to resolve the controversy. J & B, however, remained involved in the transaction through its repurchase obligation to IHCC for over forty thousand dollars. In addition to this significant financial interest in the transaction, J & B's knowledge of the whole affair undermines its characterization of itself as an innocent third party who purchased the repossessed truck in good faith.

Yet J & B asserts that it was acting for IHCC and not for itself, and therefore it should not be found jointly and severally liable. Both J & B and IHCC, however, make a profit whenever J & B sells an International Harvester truck with IHCC financing. Furthermore, even if we accept J & B's characterization of itself as an agent (in solely acting for IHCC) and not as a principal, this does not make J & B any less liable for the tort of conversion.

An agent who wrongfully converts another's property, or who assists his principal in so doing, is personally liable for the conversion. *Producers Livestock Loan Co.* v. *Idaho Livestock Auction, Inc.*, 230 F.2d 892, 893 (9th Cir. 1956). This is true even if the agent commits the act in good faith, and without knowledge of the owner's rights, and in obedience to his principal's commands. *Wells Fargo Bank & Union Trust Co.* v. *Dowd*, 139 Cal. App. 2d 561, 294 P.2d 159, 168 (1956). The agent need gain nothing from the transaction. *Schwartz* v. *Schwartz*, 82 Misc. 2d 51, 365 N.Y.S.2d 589, 592 (Sup. Ct. 1975).

In addition to attempting to negotiate a new contract with plaintiff, J & B sent an employee from Burlington to Newport to pick up plaintiff's truck to drive it back to Burlington. J & B then sold plaintiff's truck with the attached logging equipment in which *none* of the defendants had any interest. Given these facts, the trial court's finding that J & B is jointly and severally liable with IHCC and North Country for conversion of plaintiff's truck and equipment is not clearly erroneous.

## B.

J & B next asserts that the trial court erred in dismissing its crossclaims for indemnification against IHCC and North Country. This Court has recently stated that, in Vermont, a right of indemnity exists among joint tortfeasors only where "(a) there is an express agreement or undertaking by one to indemnify the other, or (b) the circumstances are such that the law will imply such an undertaking." *Hiltz* v. *John Deere Industrial Equipment Co.*, 146 Vt. 12, 14, 497 A.2d 748, 751 (1985) (quoting *Bardwell Motor Inn, Inc.* v. *Accavallo*, 135 Vt. 571, 572, 381 A.2d 1061, 1062 (1977)). In this case, no express agreement or undertaking existed between the defendants for indemnification. Furthermore, the circumstances are not such that the law will imply any right of indemnification. "[O]ne is not entitled to indemnity from a

joint tortfeasor merely because one may be free from negligence, or another is more at fault." *Id.* at 15, 497 A.2d at 751.

 Finally, J & B is not entitled to contribution from the other defendants. There is no right of contribution among joint tortfeasors in Vermont. *Howard* v. *Spafford*, 132 Vt. 434, 435, 321 A.2d 74, 75 (1974) (states reasons why Vermont law precluding contribution between joint tortfeasors would not be overruled); see also *Hiltz, supra*, 146 Vt. at 15-16, 497 A.2d at 751-52 (court declined to abrogate rule barring contribution among joint tortfeasors).

## C.

J & B next claims that, because a mutual mistake occurred which plaintiff failed to resolve in a commercially reasonable manner, the trial court erred in judging that the defendants converted plaintiff's property.

 This Court "will not interfere with a lower court's conclusions of law where the findings are sufficient to support them . . . ." *Steele* v. *Steele*, 142 Vt. 112, 114, 453 A.2d 400, 401 (1982). In this case, the trial court specifically concluded that any mistake in computations was solely the fault of IHCC. Our review of the record shows that the evidence supports the findings and the findings support the trial court's conclusion that the mistake was neither obvious, nor mutual.

J & B also argues that plaintiff found the proposed revised payment schedule to be acceptable, and, that by not signing the revised contract, he gave his implied consent to the repossession of his truck. The trial court found that plaintiff did not agree to the proposed revised payment schedule. Our review of the record again fails to show that the trial court's finding is clearly erroneous or unsupported by the evidence.

## D.

J & B next asserts that the court erred in not finding that the plaintiff had materially misrepresented the amount he owed on his old truck. The retail order indicated that the indebtedness on the trade-in vehicle was $7,500.00. J & B claims that this figure did not include plaintiff's $2,300.00 debt to OCCSA and, further, that J & B would not have completed the sale had it known the

actual amount of the indebtedness secured by the trade-in vehicle.

The trial court specifically found that when plaintiff signed the purchase order, he estimated to the J & B salesman that he owed a balance of $7,500.00 on his truck to NEMB and about $2,300.00 to OCCSA. The court further found that J & B was not particularly concerned about the OCCSA debt because it was to be subordinated to the lien of J & B and paid off by plaintiff. J & B proceeded to complete the sale despite the trial court's finding that J & B was aware of the correct amount of indebtedness on plaintiff's truck. The court did not find credible the evidence that plaintiff represented the OCCSA debt to be only three or four hundred dollars.

"It is within the purview of the trier of fact to determine the weight of the evidence, the credibility of the witnesses and the persuasiveness of the testimony, and to accept or reject any of that testimony." *Gramatan Home Investors Corp.* v. *Starling*, 143 Vt. 527, 532, 470 A.2d 1157, 1160 (1983) (citations omitted). The trial court is free to choose the evidence it finds persuasive. *Darken* v. *Mooney*, 144 Vt. 561, 568, 481 A.2d 407, 412 (1984). We find no error in the trial court's findings of fact on this issue.

### E.

J & B next argues that the trial court erred in finding and adjudging J & B liable to the plaintiff for consequential damages for breach of the warranties of merchantability, 9A V.S.A. § 2-314, and of fitness for a particular purpose, 9A V.S.A. § 2-315. We agree that the trial court erred on this issue.

In Vermont, exclusions or modifications of the implied warranty of merchantability or fitness do not apply to sales of new or unused *consumer* goods or services. Any attempt by a seller to "exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable." 9A V.S.A. § 2-316(5). This applies to "sales of new or unused *consumer goods* or services." *Id.* (Emphasis added). The section further states that " 'consumer' means consumer as defined in chapter 63 of Title 9." *Id.*

Title 9 V.S.A. Chapter 63, entitled Consumer Fraud, defines "consumer" as

any person who purchases or contracts for the purchase of merchandise or services not for resale in the ordinary course of his trade or business but for his use or benefit or for the use or benefit of a member of his household or in connection with the operation of his household.

9 V.S.A. § 2451a(a).

Plaintiff could, arguably, be defined as a consumer under this section because he bought the truck not to resell it, but for "his own use or benefit." However, "goods" is defined in the same section as "all tangible personal chattel including motor vehicles . . . when purchased primarily for personal, family or household use and not for *commercial*, industrial or agricultural use . . . ." *Id.* (Emphasis added). Because plaintiff purchased the truck primarily for commercial purposes, for use in his logging business, the truck cannot be classified as consumer *goods*.

Furthermore, the definition of "consumer goods" as applied to 9A V.S.A. § 2-316(5) is set forth in 9A V.S.A. § 9-109. 9A V.S.A. § 2-103(3). "Goods are 'consumer goods' if they are used or bought for use primarily for personal, family or household purposes." Thus, goods are classified according to consumer use, and "[t]he statute clearly implies that goods used by a consumer for commercial purposes are not 'consumer goods.' " *Barrett* v. *Adirondack Bottled Gas Corp.*, 145 Vt. 287, 294, 487 A.2d 1074, 1078 (1984). Because plaintiff purchased the truck for commercial use in his logging business, he was not a consumer within the meaning of 9A V.S.A. § 2-316(5). Therefore, the trial court erred in determining that the exclusion of warranties of merchantability and fitness for a particular purpose were rendered unenforceable by 9A V.S.A. § 2-316(5).

The trial court computed consequential damages for plaintiff's lost income when the truck was unavailable due to breach of warranty as $1,859.80 including interest. Because plaintiff was not entitled to consequential damages, we vacate this award.

*The judgment order entered June 8, 1983 is amended by striking therefrom the consequential damage award to plaintiff against J & B in the amount of $1,859.80, and said judgment order is affirmed as amended.*