Linda **FOUCHER**, Plaintiff,

v.

**FIRST VERMONT BANK & TRUST CO., and Charles J. Marro, Administrator, C.T.A. of the Estate of Raymond Reilly, Sr., Defendants.**

**FIRST VERMONT BANK & TRUST CO., Third–Party Plaintiff,**

v.

**Charles J. MARRO, Administrator, C.T.A. of the Estate of Raymond Reilly, Sr., Third–Party Defendant.**

**File No. 2:91–CV–404.**

United States District Court, D. Vermont.

April 7, 1993.

Arthur J. Kenlan, Abell, Kenlan, Schwiebert & Hall, Rutland, VT, for plaintiff.

Gary R. Kupferer, Webber & Costello, Rutland, VT, for defendant First Vermont Bank and Trust Co.

Alan Philip Biederman, Biederman & Rakow, Rutland, VT, for third-party defendant Charles J. Marro, Adm'r C.T.A. of the Estate of Raymond Reilly, Sr.

## OPINION AND ORDER

PARKER, Chief Judge.

Plaintiff, Linda Foucher, has sued the defendants, First Vermont Bank & Trust Co. ("the Bank" or "First Vermont Bank") and Charles J. Marro, in his capacity as administrator of plaintiff's father's estate ("the Estate), for damages arising out of an alleged conversion of her assets. Foucher states four claims against the Bank: (1) wrongful conversion of assets held in joint tenancy; (2) breach of duty as a bailee; (3) breach of a fiduciary duty as an agent; and (4) bad faith. In her claim against the Estate, Foucher asserts that the Estate is liable for the value of the converted assets because it is vicariously liable for the decedent's misdeeds in forging the plaintiff's name to obtain the wrongful transfer and ultimate conversion of the assets.[1] The Bank has filed a third party complaint against the Estate for indemnification, alleging that the Bank acted in reliance on the decedent's representations.

The Bank has filed numerous summary judgment motions which can be summarized as asserting four grounds for judgment in its favor. First, the Bank claims that Foucher has no ownership interest in the properties in issue. Second, by statute, the Bank's liability as a signature guarantor does not extend to the owner of a security, only to those taking or dealing with the security in reliance on the guarantee. Third, the appropriate statute of limitations bars the plaintiff's breach of duty claims against the Bank. Finally, the Bank moves for summary judgment on its indemnification claim against the Estate claiming that it was acting in accordance with the decedent's instructions.

Foucher has responded to these various motions and has filed a cross-motion for partial summary judgment on the issue of her ownership interest in the assets in question. She has also separately filed a motion for summary judgment on the conversion claim. Finally, and not surprisingly, the Estate opposes the Bank's claim for indemnification.

This Opinion and Order addresses all of the issues raised in the various motions.[2]

### Undisputed Material Facts [3]

1. The plaintiff, Linda Foucher, is a resident of Florida.

2. First Vermont Bank, a defendant, is a Vermont banking corporation with its office

---

1. Foucher's original Complaint named only the Bank as a defendant. The Bank thereafter asserted a third-party complaint for indemnification against the Estate. (Paper No. 6) In November, 1992, Foucher amended her Complaint to assert a claim against the Estate as well. (Paper No. 51)

2. The Bank has requested a hearing on the motions. However, as the parties have extensively, if not voluminously, briefed the issues before the Court the motions may be decided without oral argument. See Local Rule of Procedure 5(A)(IV).

3. The Bank would be well advised to take note of Local Rule 5(C)(I) which requires a party moving for summary judgment to file a separate, short concise statement of undisputed material facts. The purpose of this rule is to assist the Court in

framing a clear picture of the factual issues which remain in the case. This purpose is thwarted when multiple motions of interlocking arguments and facts are filed without a separate specific factual statement.

For present purposes, the Court is hard-pressed to find a concise statement of facts from the maze of piecemeal filings in this case. Consequently, the Court has had the inconvenient and cumbersome task of assimilating the Bank's relevant factual presentations from its various arguments. While the Court declines in this instance to impose the harsh result of denying the Bank's motions solely on the basis of a failure to comply with the local rule, a result expressly contemplated by Local Rule 5(C)(I), the Bank's counsel should consider themselves forewarned should they invoke the summary judgment process in this Court in the future.

and principal place of business in Brattleboro, Vermont.

3. The decedent, Raymond A. Reilly, Sr. ("Reilly"), was Foucher's father and a resident of Vermont at the time of his death in November, 1990. The Estate of Reilly, a defendant in this action, was opened and is pending in Probate Court in the District of Rutland. Florence Reilly, the decedent's wife, and Raymond Reilly, Jr., his son, were named co-executors of the Estate. Charles Marro was thereafter named Administrator, C.T.A. of the Estate.

4. Prior to September, 1988, the following assets were titled in Foucher and Reilly's names as joint tenants with rights of survivorship:

(a) stock certificates ("stocks") issued to Linda Foucher *and* Raymond Reilly Sr. which represented 300 shares of Homestead Financial Corporation, 200 shares of Echo Bay Mines, Ltd., 200 shares of Zenith Electronics, 200 shares of Mahogany Minerals Resources, Inc., 200 shares of Vermont Federal Bank, 300 shares of Long Island Lighting company, 200 shares of Chittenden Corporation, and 458 shares of Banknorth Group, Inc.;

(b) a bond account at the brokerage firm of A.G. Edwards & Sons, Inc. ("Edwards account") in the name of Linda Foucher *and* Raymond Reilly, Sr. containing cash and the following bonds held in a nominee name for the Depository Trust: 5,000 Vermont 12.5%, 12–1–92, Municipal Bond Bank, Series A, Escrow to Maturity; 10,-000 shares Burlington, Vt., 7.1%, 5–1–99, General Obligation, Unlimited Tax; 5,000 Vermont 7.3%, 9–1–13, EDL & HLTH Bldg Financing Agency—Registered Medical Center Hospital of Vermont, Series A, Rev–Issue 1986; 10,000 Vermont 7.7%, 12–1–96, HSG Financing Agency Home Mtg. Pur, Series A, Book entry Only Subject to "Amt"; 5,000 Vermont 10,75%, 12–1–04, Municipal Bond Bank, Series A—Registered; 20,000 Vermont 7.25%, 12–1–0–, Municipal Bond Bank, Series B—Refunding Bond, Registered;

(c) two investment accounts at Fidelity Investments of Boston, Massachusetts ("Fidelity") in the name of Linda Foucher *and* Raymond Reilly, Sr.; and

(d) two investment accounts at Dreyfus Tax Exempt Bond Fund of Newark, New Jersey ("Dreyfus") in the name of Linda Foucher *and* Raymond Reilly, Sr..

5. Up until his death, Reilly retained all income generated from these joint assets and declared that income on his income tax returns. Furthermore, Reilly managed the Edwards account and made investment decisions relative to all the joint accounts. Foucher was aware of the existence of these accounts having signed signature cards for them and understood that her father would manage them.

6. Foucher and Reilly held accounts at First Vermont Bank. The Bank had in its possession a signature card bearing Foucher's signature.

7. On June 6, 1988, Reilly opened an investment account solely in his name at the Bank and executed an Investment Management Agreement with the Bank. Kyle Fisher ("Fisher"), Vice President and Trust Officer of the Bank, assisted Reilly in these transactions.

8. On June 14, 1988, Reilly deposited the stocks issued to Foucher and Reilly in the Bank's Trust Department. The Bank issued a receipt executed by Fisher acknowledging joint ownership. The stocks were held in a safety deposit box to which both Foucher and Reilly had access. Fisher acknowledges that at that time he was aware that Foucher was a customer of the Bank.

9. Assisted by Fisher, Reilly advised A.G. Edwards in a letter dated July 28, 1988, that he wished to transfer the assets in the Edwards account to the Bank and that a letter from Fisher would follow with instructions for the transfer. A.G. Edwards was further advised to contact Fisher should any questions arise regarding the transfers. On August 8, 1988, Fisher instructed A.G. Edwards to transfer the assets in the Edwards account to various locations. Electronic transfers and physical deliveries were to be made to the Bank's nominee, Marine Midland Bank, government securities were to be transferred to the Federal Reserve Bank of Boston, and

cash was to be delivered to First Vermont Bank.

10. In his letter to A.G. Edward, Fisher noted that he had enclosed authorization letters from Reilly for the transfer. The Burlington office of A.G. Edwards forwarded the documentation to the A.G. Edwards office in St. Louis, Missouri, for processing. Upon receipt of the documentation, A.G. Edwards personnel in St. Louis noticed that Foucher's signature was missing. The documents were returned to the Burlington office for her signature. Later, when A.G. Edwards received them back, Foucher's name had been signed below Reilly's on the July 28 letter authorizing the transfer. This signature was not Foucher's, and it is conceded that Reilly affixed her signature without authority to effect the transfer. A.G. Edwards did nothing to verify the genuineness of the signatures.

11. On September 13 and 14, 1988, A.G. Edwards delivered the bonds from the Edwards account to Marine Midland to be deposited into the Bank's account there. When the bonds were electronically transferred they were accompanied by a trailer which indicated joint ownership. The Bank was aware that the bonds were held in a joint account for the benefit of Foucher and Reilly, but that the bonds themselves were titled in their street names. It was the testimony of Michael French, an agent for A.G. Edwards, that when an entire account is transferred, as it was in this case, it is transferred "in kind." That is, a joint account is transferred to the next financial institution as a joint account. Upon receiving the assets in the Bank's account at Marine Midland however, the Bank credited Reilly's investment account titled solely in his name.

12. On September 21, 1988, A.G. Edwards disbursed the cash from the Edwards account to the Bank by delivering a check in the amount of $12,911.40 to the Bank, payable to the Bank, "A/C of Raymond A. Reilly, Sr. and Linda Foucher." The check was endorsed by the Bank and deposited into Reilly's investment account. Fisher agreed that there was no basis for such deposit as

Foucher had not agreed to it. Furthermore, he conceded that it would have been prudent banking practice to deposit the proceeds of this check in an account titled in both Reilly and Foucher's names.

13. On August 22, 1988, Fisher executed a guarantee of signature on letters written by Reilly to Fidelity Investments and Dreyfus Tax Exempt Bond Fund. These letters purported to be authorizations to liquidate the joint accounts held by Foucher and Reilly.[4] The letters further instructed both Fidelity and Dreyfus to make a check for the proceeds of the accounts payable to the registered shareholders, Reilly and Foucher. The check was to be mailed to Fisher at the Bank. Although Linda Foucher's name appeared in a signature form on the letters, those signatures were invalid. It is conceded by the Bank that Reilly had forged Foucher's signature to effect the transfer. Dreyfus and Fidelity were apparently unaware of the forgery.

14. Upon liquidating the two joint accounts held by Foucher and Reilly, Fidelity Investments issued two checks in the amounts of $49,440.96 and $4,397.20. These checks were made payable to the Bank "FBO Raymond A. Reilly, Sr. & Linda R. Foucher." Dreyfus also liquidated the two joint accounts held by Foucher and Reilly and issued two checks in the amounts of $9,641.82 and $4,226.21. These checks were may payable to "Raymond A. Reilly, Sr. & Linda R. Foucher c/o First Vermont Bank & Trust Co." Upon receipt of the checks from Fidelity and Dreyfus, the Bank endorsed the checks and deposited them into Reilly's investment account titled only in his name. Fisher has stated that it would have been prudent banking practice to obtain an endorsement from Foucher before doing so, and that without such endorsement, the proceeds of the checks should have been deposited into an account titled in both Reilly and Foucher's names.

15. On or about August 29, 1988, and September 28, 1988, Fisher executed a Guarantee of Signature on stock assignment

---

4. The Bank claims that any signature guarantees it affixed to the letters were to guarantee Reilly's signature only. However, no indication of this limitation appears on any of the documents.

forms which directed the transfer of the stocks to the Bank's nominee. The signatures on those forms purported to be those of Reilly and Foucher. However, as with the authorization letter to A.G. Edwards, Foucher's signature on the stock assignment forms was forged by Reilly. The Bank gave the forms to Reilly with instructions to have Foucher sign them. Reilly signed plaintiff's name to the documents prepared by the Bank. Upon return of the documents from Reilly, the Bank did not verify that Foucher had signed the documents herself.[5]

16. The stock certificates were then sent by the Bank to the transfer agent who effected the transfer on the corporate books. Thereafter, substituted stock certificates issued to the Bank's nominee were delivered to the Bank and placed into Reilly's investment account titled solely in his name.

17. Upon Reilly's death in November, 1990, all of the assets in his investment account became assets of the Estate from which distribution to the legatees was made. Foucher received $100,000 on January 8, 1991, as a legatee of the Estate.

18. Prior to that distribution, on January 3, 1991, Foucher sent a facsimile inquiry to the Estate's attorney, John Crowley, requesting information regarding the status of her joint accounts with her father. In that letter, she stated that she was aware of the existence of her father's investment account. She further stated that her father had advised her that Crowley had all of the accounts jointly held by Foucher and Reilly. She asked for a list or record of assets so held. Crowley immediately informed her that he did not have such a list, but that all of the jointly held assets had been transferred to her father's investment account at First Vermont Bank.

*Discussion*

## I. STANDARD FOR SUMMARY JUDGMENT

■ The purpose of summary judgment is to avoid useless trials by isolating and disposing of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate in those cases where the non-moving party has failed to produce any evidence of a genuine issue as to any material fact, and the moving party has rested his motion on a valid legal theory that entitles him to judgment as a matter of law. Fed. R.Civ.P. 56(c). All ambiguities and inferences should be resolved in favor of the nonmoving party. *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 316 (2nd Cir.1992).

■ To defeat a motion for summary judgment, a party may not merely rest upon the allegations of the pleadings; he must come forward with evidence that is more than colorable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient probative evidence which tends to support a claim or defense. *Id.*

The issue of sufficiency of proof is governed by Federal Rule of Civil Procedure 56(e). In pertinent part, Rule 56(e) provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Fed.R.Civ.P. 56(e). The permissible forms of proof are also listed in Rule 56(c): depositions, answers to interrogatories, and admissions. Fed.R.Civ.P. 56(c).

## II. OWNERSHIP OF THE ASSETS

The Bank has filed a motion for summary judgment arguing that the plaintiff cannot establish a valid inter vivos gift, and therefore, she had no ownership interest in the assets in issue here. The Bank does not

---

**5.** Again, the Bank claims that the guarantee it affixed to forms only guaranteed Reilly's signature; however, no such limitation is indicated on the forms.

dispute that Foucher and her father jointly held the assets. Essentially, the Bank contends that Reilly contributed the money used to purchase the assets and that Foucher cannot prove that Reilly manifested an intent to create a present interest in these jointly held assets in his daughter. The Bank further states that Reilly held the assets jointly because he was using joint ownership as his estate distribution plan. Foucher, in reply, argues that the issue of whether a valid gift was made is not germane to the Court's inquiry because the Bank has acknowledged that she held the accounts and stocks in joint tenancy with Reilly with rights of survivorship.

■ The Bank appears to be arguing that while Foucher may have had unity of title, possession and time, she did not have an interest in the assets. However, a quick glance at the law of joint tenancies and gifts reveals that the defendant is mistaken. It is commonly recognized that a joint tenancy has four essential elements, or four "unities": the unities of interest, title, time and possession. *Methodist Church v. First Nat'l Bank,* 125 Vt. 124, 128, 211 A.2d 168 (1965). "In a joint tenancy each is said to have the seisin of the whole but has title only to his aliquot part." *Id.* Under Vermont law, joint tenancies may be created in personal property, either by grant or devise, or by agreement of the parties. *Guilmette v. Franklin Realty Corp.,* 127 Vt. 130, 134, 241 A.2d 323 (1968). Thus, the fact that Reilly may have contributed all of the funds for the purchase of the assets at issue here will not deprive the plaintiff of her interest in the assets and her claim in this matter.

Furthermore, Vermont caselaw has established that, at least with regard to the stocks, Reilly's voluntary act in titling the stocks in both his and his daughters names, as joint tenants with rights of survivorship, constitutes delivery of a gift. *Phillips v. Plastridge,* 107 Vt. 267, 269–70, 179 A. 157 (1935). It is also generally presumed that one intends the natural consequences of one's acts. *In re Estate of Adams,* 155 Vt. 517, 521, 587 A.2d 958 (1990). Thus, by titling the stocks in both names as joint tenants with right of survivorship, Reilly's intent to create a pres-

ent interest in the donee is presumed. Finally, the law presumes acceptance when a gift is unaccompanied by any condition, and this is particularly true where the gift flows from a parent to a child. *Phillips,* 107 Vt. at 270, 179 A. 157. This principle applies even though the child may not be aware of the gift. *Id.* With regard to the ownership of the stocks then, Foucher's interest is easily established.

The same type of analysis is persuasive with regard to Foucher's ownership of the bond and investment accounts jointly held by Foucher and Reilly. Moreover, as Foucher has pointed out, this interest is evidenced by the requirement of her signature on all transfer documentation. Accordingly, the Court holds that Foucher's ownership interest in all of the assets as a joint tenant with rights of survivorship has been established.

■ In some of the Bank's subsequent filings, an argument is made that even if Foucher had an interest in the assets prior to their transfer, that interest was lost upon the Bank's receipt of them and its subsequent deposit of the assets into Reilly's account pursuant to his instructions. The Court fails to see the logic in this argument. A joint tenant cannot terminate a co-tenant's interest by conveyance of the whole for his title only extends to an aliquot part. *In re Estate of Boynton,* 121 Vt. 98, 107, 148 A.2d 115 (1959). "A joint tenant of personal property has such title thereto that he may maintain an action against a co-tenant who sells or destroys the same." *Rice v. Bennington County Savings Bank,* 93 Vt. 493, 503, 108 A. 708 (1920). Reilly divested himself of sole control over the assets when he created the joint tenancy with Foucher. He cannot now be said to have properly appropriated the whole of it to his sole benefit. Thus, the Court hereby DENIES the Bank's motion for summary judgment on this issue; plaintiff's cross-motion for partial summary judgment as to her ownership of the assets is hereby GRANTED.

## III. THE EFFECT OF THE BANK'S SIGNATURE GUARANTEES

■ The Bank has moved for summary judgment against the plaintiff on her claims

regarding the stocks. Arguing that plaintiff's breach of warranty theory must fail because she did not rely on the Bank's signature guarantees, the Bank cites Vermont statutory law to that effect. *See* 9A V.S.A. § 8–312. However, as the plaintiff points out, the claims against the Bank in this case do not include one for breach of a warranty under the Vermont commercial code. The plaintiff has set forth common law tort theories of recovery: namely, conversion, negligence and bad faith. As persuasively outlined by the Sixth Circuit in a case closely analogous to this one, the statutory breach of warranty remedy is not an exclusive remedy: tort remedies co-exist. *Southern Ohio Bank v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480–81 (6th Cir.1973). Absent legal grounds entitling the Bank to judgment on the common law claims, summary judgment is inappropriate. The defendant's motion is hereby DENIED.

## IV. THE BANK'S STATUTE OF LIMITATIONS ARGUMENT

The Bank next argues that the plaintiff's claims of breach of duty as a bailee and an agent are barred by the applicable statute of limitations, 12 V.S.A. § 512(5), which governs actions for injury to property caused by the act or default of another. The limitations period for such actions is three years. 12 V.S.A. § 512 (1973). The plaintiff contends that the correct statutory provision is section 511, which governs civil actions in general and sets the limitations period at six years. In the alternative, if section 512(5) applies, Foucher argues that her action did not accrue until she discovered or should have discovered the injury. She states that she did not discover the injury to her property until after her father's death in November, 1990. As her action was commenced on December 23, 1991, it was well within the statutory period.

■ The Court agrees with the Bank that section 512(5) governs the breach of duty claims in this case. It is the nature of the harm done which determines which limitations provision applies. *Stevers v. E.T. & H.K. Ide Co., Inc.*, 148 Vt. 12, 13, 527 A.2d 658 (1987). Without doubt, plaintiff has alleged injury to her property, claiming that the defendant's breach of its duties as bailee and agent caused the loss of her property. Under the *Stevers* analysis, section 512(5) governs these claims and plaintiff's action must be commenced within three years from the time it accrued.

■ Under Vermont law an action for injuries to personal property accrues when the injury is discovered or should have been discovered. *University of Vermont v. W.R. Grace & Co.*, 152 Vt. 287, 290, 565 A.2d 1354 (1989) (*Cavanaugh* rule is not limited to personal injury actions but applies generally). The plaintiff asserts she was not aware of the loss of her assets until after her father's death in late 1990, and that it was sometime in the following Spring before she had knowledge of the transfers and alleged conversions. The defendant claims that Foucher had knowledge of the transfers in January, 1991, at the very latest. No facts have been asserted which would suggest that Foucher should have known of the transfers at any earlier date. Accordingly, I find at the earliest, plaintiff knew or should have known of the injury to her property in January, 1991. At the very earliest, her action accrued then. Since this case was filed in December, 1991, plaintiff's filing fits well within the limitations requirements of section 512(5).

## V. THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CONVERSION ISSUE

Plaintiff is seeking recovery for the loss of her assets through an alleged conversion under two theories: (1) a common law theory of conversion which applies to all of the assets; and (2) a statutory remedy for conversion of the checks issued by A.G. Edwards, Dreyfus and Fidelity. The statutory claim arises out of a provision in Vermont's commercial code, 9A V.S.A. § 3–419.

*Common Law Theory of Conversion*

Foucher's claim for conversion as to all of the assets, stocks, bonds and cash, is based on the Bank's participation in the events which ultimately resulted in the loss of her assets. She alleges that the Bank directed, facilitated and controlled every step of the

transfer transactions. First, the Bank assisted Reilly in creating an investment account. Then the Bank prepared documentation for the transfers of Reilly's various assets, affixed signature guarantees upon letters and forms authorizing the transfers, and instructed the various firms and transfer agents as to the specific transferee accounts, payees, and place of delivery. Then, without notifying Foucher or seeking her authority, the Bank asserted control over the assets and/or proceeds Foucher jointly owned with Reilly and placed them in his investment account. Foucher contends that these actions constitute dominion and control over the assets in derogation of her rights which, in turn, establishes the Bank's liability for conversion. The Court agrees.

 With the exception of a conversion by demand and refusal, common law requires that a finding of conversion be based upon some overt act by the defendant. *Economou v. Carpenter*, 124 Vt. 451, 454, 207 A.2d 241 (1965). As defined by the Vermont Supreme Court,

> Conversion consists in either appropriating property to one's own use and beneficial enjoyment, destroying or exercising dominion over it to the exclusion of owner's rights, or withholding possession from owner under claim of title inconsistent with his title.

*Vreeland v. Essex Lock and Mfg. Co., Inc.*, 135 Vt. 1, 3, 370 A.2d 1294 (1976). Certainly, the acts complained of here were overt acts. As a joint owner, Reilly's intentional actions in asserting ownership and dominion over the whole of the assets he jointly held with Foucher, and then wrongfully transferring them to the exclusion of Foucher's joint rights constitute overt acts and hence, conversion. *Cf. Swift v. Mosley*, 10 Vt. 208, 210 (1838) (discussing the law of conversion with leasehold properties). Moreover, the Bank's actions in facilitating the transfers and disposing of the assets are intentional overt acts as well.

Regardless of whether the Bank acted upon its own initiative, it is indisputable that general tort law would hold it liable in these circumstances. "All who aid in the commission of a tort by another, or who approve of it after it is done, if done for their benefit, are liable as though they had done it with their own hands." *Dansro v. Scribner*, 108 Vt. 408, 411, 187 A. 803 (1936). In this case, the Bank aided Reilly in wrongfully bringing the assets to the Bank for deposit therein and assuredly benefitted thereby. Under *Dansro*, there is clear tort liability.

 In its defense, the Bank argues that it was acting pursuant to Reilly's instruction. However, the protections of agency law afford no viable defense here. Vermont law is clear: One who, acting as an agent, aids or abets a principal in converting property is liable for that conversion. *Murray v. J & B Int'l Trucks*, 146 Vt. 458, 467, 508 A.2d 1351 (1986). The agent need not gain anything from the transaction to be held liable. *Id.* Moreover, the defenses of good faith or lack of knowledge of an owner's rights are of no avail. *Id.* The uncontroverted facts thus establish a case of conversion against the Bank.

The Bank pursues a theory of ratification and estoppel, arguing that ratification may be established by showing that Foucher accepted proceeds from the converted property. That is, the Bank contends that by accepting the $100,000 distribution from the Estate, Foucher accepted proceeds from the assets in question and in so doing, ratified the conversion. *See* 18 *Am.Jur.2nd: Conversion* § 103 at 218 (1985). However, without a finding of an intent to ratify, it is unsettled whether under the law of conversion in Vermont such receipt will bar an action for conversion or merely reduce any recovery by the amount received. *See Moore v. Hill*, 62 Vt. 424, 429, 19 A. 997 (1890) (Finding of knowledge and intent bars action for conversion); *see also Bradley v. Brigham* 149 Mass. 141, 21 N.E. 301 (1889), *as cited in* 3 A.L.R.2d 218, 228–29 (1949) (holding that without intent to ratify, acceptance of proceeds does not operate to bar conversion action); *Commercial Credit Corp. v. Stan Cross Buick, Inc.*, 343 Mass. 622, 180 N.E.2d 88 (1962) (same).

 The Court is guided, however, by general principles of common law estoppel and ratification. First, the burden of proving

that a party is estopped from asserting a claim is on the party pleading such estoppel. *Price v. Department of Employment and Training,* 150 Vt. 78, 80, 549 A.2d 641 (1988). Furthermore, knowledge of the facts is an essential element of estoppel and ratification. *Fleury v. Town of Essex Zoning Bd. of Adjustment,* 141 Vt. 411, 418, 449 A.2d 958 (1982); *In re Wright,* 131 Vt. 473, 492, 310 A.2d 1 (1973). Accordingly, this Court holds that a showing of knowledge of the facts and an intent to ratify is required to bar a conversion action when a plaintiff has received proceeds of converted property. Absent a showing of intent to ratify, acceptance of the proceeds of converted property works only to mitigate damages. With these principles in mind, the Court now turns to the question of Foucher's knowledge and intent in receiving distribution under her father's will.

 The plaintiff asserts that she was not aware of the fact that the distribution she received from the Estate was comprised of the assets she jointly held with her father. The record reveals only that Foucher was told a few days before the distribution was made that the assets she jointly held with her father had been placed in his investment account. She concedes only that she knew the investment account existed, but not its exact nature or contents. There is no indication that she understood that her assets had been liquidated to provide for the distribution to all of the legatees. The Bank's sole proof on this issue is the Crowley letter, but that letter only establishes that Foucher was told that the assets were in the investment account, not that they had been converted or liquidated. Furthermore, Foucher stated that she did not understand what an investment account was.

Consequently, the Court finds that the Bank cannot carry its burden in establishing its defense of ratification or estoppel. Summary judgment is appropriate where a party fails to make a sufficient showing to establish the existence of an element essential to that

party's claim or defense and on which that party bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Accordingly, plaintiff's motion for partial summary judgment on her common law claim of conversion is hereby GRANTED. Having granted said motion, the Court need not reach plaintiff's alternative theory of conversion under statutory law. Further factual development is needed before deciding the issue of damages.

## VI. THE INDEMNIFICATION CLAIM

The Bank, as third-party plaintiff in this action, has filed a claim for indemnification from the Estate for any liability to the plaintiff that the Bank may incur as a result of this lawsuit. The Bank now moves for summary judgment on this claim, arguing that the facts of the case imply a right of indemnification. The Estate, the third-party defendant, contends that neither the law of indemnification nor the facts of this case establish indemnification by implication. As a preliminary procedural matter however, the Estate takes issue with the sufficiency of the Bank's proof.

### A. *Rule 56(e) and Vermont's Dead Man's Statutes*

The gist of the Estate's argument is that summary judgment motions must be supported by evidence that is admissible at trial and that the Bank has failed to meet this requirement. Specifically, the Estate challenges the Fisher affidavit, noting that it references statements or instructions from Reilly, the decedent, who is represented by the Estate. Such statements allegedly violate Vermont's Dead Man Statute, 12 V.S.A. § 1602 (1973).[6] The Estate also argues that section 1603 of title 12 applies here; however, that statute expressly provides that it does not apply to actions founded on tort, such as this one. 12 V.S.A. § 1603; *D'Arc*

---

**6.** The Estate has also challenged the form of the affidavit, stating that the competency of the affiant is not apparent. Specifically, the affidavit lacked information as to Fisher's personal knowledge, age and mental state. In reply, the Bank furnished this information in the form of a new affidavit which recited the same facts as the initial affidavit but included as well statements as to his age, mental state and personal knowledge of the events. (Paper No. 80) This aspect of the Estate's challenge has thus been rendered moot.

*Turcotte v. Estate of LaRose*, 153 Vt. 196, 569 A.2d 1086 (1989). Therefore, the Estate's arguments are properly confined to the provisions of section 1602.

■ The Bank has responded to the Estate's challenge by simply stating that federal procedural and evidentiary rules apply in this case and preclude resort to Vermont's Dead Man's statutes. In the alternative, the Bank argues that its use of Reilly's statements is a limited one: to make clear how the assets ended in his investment account. The Bank contends that this use does not implicate the real purpose of the Dead Man's Statutes, prevention of fraudulent practices, and thus, it is reasonable to apply a statutory exception in this case. Finally, the Bank argues that fairness requires the admissibility of Reilly's statements so that the Bank may fully present its case in what is essentially a family dispute.

The Estate's argument regarding the application of the Dead Man's Statute, section 1602, prevails.[7] Essentially, the Estate has challenged three statements contained in the Fisher Affidavit, paragraphs six, ten and eleven. Paragraph six states:

That at the request of Raymond A. Reilly, Sr. the Trust Department at the Bank prepared documentation to facilitate the transfer of assets titled in joint names with various family members, including Linda Foucher.

(Paper 80, para. 6). Paragraph ten states:

That Raymond A. Reilly, Sr. instructed me to credit an account he had set up at the Bank in his sole name under an Investment Management Agreement with the A.G. Edwards assets when they were received by the Bank, including depositing the check in the amount of $12,911.40 into said account.

(Paper 80, para. 10). Paragraph eleven states:

That Raymond A. Reilly, Sr. instructed the Bank to place all assets referenced in the plaintiff's Complaint into said account.

(Paper 80, para. 11). The Court agrees with the Estate that the admissibility of these statements is governed by the second sentence in Federal Rule of Evidence 601, a provision which was meant to accommodate federalism concerns regarding the protections of state dead man statutes in diversity cases.[8] 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6001 at 26–27 (1990) (discussing history and purpose of Rule 601). Rule 601 retains a reference to state law as the governing law on issues of competency when state law provides the rule of decision in civil cases. Fed.R.Evid. 601. This being a civil action founded in diversity in which Vermont substantive law provides the rule of decision, section 1602 governs the question of whether Reilly's statements to Fisher are competent evidence in this case.

As noted by the Bank, section 1602(5) provides an exception to the general rule disqualifying interested parties from testifying in their own favor when the other party is deceased. Subsection (5) makes memoranda and declarations of a deceased person admissible in tort actions by or against representatives of that deceased person. However, this exception does not apply to *conversations* with the deceased unless they are limited solely to the purpose of meeting or explaining the deceased's memoranda or declarations. 12 V.S.A. § 1602(5). This is the exception the Bank seeks to apply to the Fisher affidavit.

■ The Bank's argument fails on this issue. Reilly's instructions as referred to in the Fisher Affidavit are not declarations or memoranda. They are pieces of conversations Reilly had with Fisher. Moreover, the purpose of Fisher's reference to these con-

---

**7.** This ruling is limited to the indemnification claim only. The Court makes no determination as to the application of the Dead Man's Statute in a common law fraud claim against the Estate on the basis of an alleged forgery since that issue is not presently before the Court.

**8.** Rule 601 provides:

Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law. Fed.R.Evid. 601.

versations was not to meet a declaration or memoranda of Reilly, but to explain and defend *the Bank's* actions. As such, they are expressly excluded from the subsection (5) exclusion. Accordingly, these statements would not be admissible in evidence in this case and shall be disregarded by the Court for purposes of deciding this summary judgment motion.

### B. *The Law of Indemnification*

 Both the Bank and the Estate are defendants in this action. The Bank has made a claim against the Estate for indemnification against a joint tortfeasor who is also a co-defendant. The right of indemnity is distinct from that of contribution.

> The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis. The right of indemnity, on the other hand, because of some special relationship existing between two tortfeasors shifts the entire loss upon the real wrongdoer.

*Viens v. Anthony Co.,* 282 F.Supp. 983, 985 n. 2 (D.Vt.1968) (J. Leddy) (*citing Great American Ins. Co. v. Evans,* 269 F.Supp. 151, 154 (D.Vt.1967). Vermont law precludes contribution for both intentional and negligent tortfeasors. *Howard v. Spafford,* 132 Vt. 434, 435, 321 A.2d 74 (1974). Generally, indemnity is also barred. *Spaulding v. Oakes,* 42 Vt. 343, 347 (1869). There are however, two exceptions to the general rule of indemnity preclusion: (1) where there is an express understanding to indemnify; and (2) when the circumstances of the transactions between the parties are such that the law will imply a right of indemnification. *Viens,* 282 F.Supp. at 985–86. The Bank admits that the first exception does not apply in this case—no express agreement exists. Instead, the Bank argues that the second exception should apply here. At this juncture of the litigation, the Bank's argument cannot succeed.

 Tortfeasors who are deemed to be actively liable may not be indemnified by another unless it is by express provision. *Ryan v. New Bedford Cordage Co.,* 421 F.Supp. 794, 797 (D.Vt.1976). Implied indemnity from a joint tortfeasor will arise only in cases of liability based on passive fault. *Murray v. J & B Int'l Trucks,* 146 Vt. 458, 468, 508 A.2d 1351 (1986); *Viens,* 282 F.Supp. at 987. As noted in Section V above, the Bank was actively involved in the conversion of assets. Accordingly, indemnification from the Estate is inappropriate for the Bank's liability based on the plaintiff's claim of conversion. In addition, as the Estate points out, it is not yet clear to what extent the Bank may be liable under a negligence theory. Accordingly, since a factual record must be developed on this issue, summary judgment is inappropriate.

### Conclusion

For the foregoing reasons the Bank's motions for summary judgment are hereby DENIED. (Papers # 56–60 in Court's docket). The plaintiff's cross-motion for partial summary judgment on the issue of ownership of the assets is hereby GRANTED. (Paper # 82 in Court's docket). The plaintiff's motion for summary judgment against the Bank on her claims of conversion is hereby GRANTED. (Paper # 63 in Court's docket).