[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The respondent, Pamela C., who was born on March 23, 1970, has been addicted to cocaine since before the births of the children who are the subject of these proceedings. On June 17, 1992, she gave birth to Shanbash C. At his birth, both Shanbash and his mother tested positive for cocaine. Pamela had not received prenatal care.
A few weeks after his birth, Shanbash suffered water intoxication as a result of malnutrition.[1] His mother had been diluting his formula. Shanbash was in respiratory distress and suffered abdominal distention, seizure activity, dilated pupils and serious temperature drop. His condition could have been fatal or could have resulted in serious brain damage. He was diagnosed as failure to thrive. An intensive Family Preservation worker was assigned to Pamela upon Shanbash's discharge from the hospital and assisted Pamela in the proper feeding of the infant. On September 18, 1992, Pamela entered into a "service agreement" with the Department of Children and Youth Services (hereinafter DCYS or the Department). In it the respondent agreed to cooperate with family preservation services, to provide proper medical care for her children, to follow up with all necessary medical treatment for Shanbash that was recommended by Bridgeport Hospital, to "provide proper formula for [the] child Shanbash and not dilute the formula as she was doing", to provide proper nutrition for Shanbash and monitor his weight and cooperate with drug treatment. Nonetheless, Pamela continued to deny that she had a problem with illegal drugs, specifically cocaine. She repeatedly insisted that she only used cocaine occasionally, but that it was not a problem.
On September 28, 1992, the commissioner of the Department of Children and Youth Services (commissioner) brought a petition against Pamela and Shanbash's father, Efrain B., alleging that Shanbash was neglected. Specifically, the petition alleged "1. Infant has not been taken for regular medical care and hasn't received his inoculations. 2. Infant was brought into Bridgeport Hospital emergency room due to water intoxication, as a result of improper nutrition. 3. Infant is in the 10th percentile for weight and was diagnosed `failure to thrive.'" Thereafter, Pamela missed appointments with her assigned social worker and CT Page 9750 failed to seek drug treatment. She again became pregnant by the respondent Efrain B. who lived with Pamela but would voluntary absent himself from the home for varying periods of time, allegedly living with relatives. At this time, Pamela had difficulty with budgeting, substance abuse, and properly feeding Shanbash. About twice a month, Pamela would run out of food in the home. The home was dark and dirty. Utilities were turned off for extended periods of time due to nonpayment. Shanbash had not received his inoculations. Pamela's social worker would arrange for her to receive food vouchers. By letter dated December 4, 1994, her social worker informed Pamela that her continued use of cocaine and failure to seek treatment would result in the Department's requesting that Shanbash be committed. On December 11, 1992, her social worker again wrote to Pamela again emphasizing the consequences that would follow her failure to obtain drug rehabilitation treatment.
On January 4, 1993, Shanbash was adjudicated neglected and placed under protective supervision for six months. Immediately after that adjudication, the court issued "expectations" to the respondent Pamela, instructing her, inter alia, not to engage in substance abuse and warning her that if she did not fulfill the expectations of the court that the commissioner would file a petition to permanently terminate her parental rights so that Shanbash could be adopted.
Later that month, Pamela's social worker was twice unable to meet with her and Pamela had failed to get drug treatment. In February 1993, ECAR[2] began working with Pamela. Pamela accepted ECAR's services on a limited and selective basis and resisted ECAR's attempts to engage her in substance abuse treatment. On February 10, 1993, the Department of Children and Youth Services entered into another service agreement with Pamela. Again, a term of the agreement was that she participate in drug evaluation and counselling. The agreement warned the respondent that if she failed to adhere to the conditions of the agreement, "DCYS will pursue commitment and foster care placement."
On February 24, 1993, Pamela again appeared in court. At that time, Shanbash was doing better. New expectations were issued which provided, inter alia, that Pamela would not engage in substance abuse and would cooperate with the "ECAR" (empowered children at risk) and CASA programs. She made several appointments with Project Courage, a drug rehabilitation program in Bridgeport.[3] On February 23, February 25, and April 19, CT Page 9751 1994, she tested positive for cocaine and refused in-patient treatment.
On April 14, 1993, the earlier disposition of protective supervision based on an adjudication of neglect was modified to a commitment of Shanbash because of his mother's failure to comply with the court's expectations. The child was placed in a foster home. The court once again reviewed its expectations with the respondent mother. On April 28, 1993, Pamela again entered into a service agreement with the Department in which, inter alia, she agreed to cooperate with ECAR and to attend Project Courage. She agreed that if she were unable to stop using drugs as evidenced by the presence of cocaine in her urine, she would agree to inpatient treatment. She also agreed to keep all scheduled visits with Shanbash.
In the immediate aftermath of Shanbash's commitment, his mother did attend all scheduled visits. However, she curtailed her visits during the summer of 1993. She missed his birthday party, his PPT, and an in-court review of the case. Between August 1993 and February 1994, she saw her son, Shanbash, only three times. During the entire duration of Shanbash's commitment, his father, Efrain B., has only seen him once, for a single twenty minute visit. He has never been present for any in-court proceedings. The docket sheet contains notations reflecting that in June, 1993, the respondent Pamela was not fulfilling the terms of the court's expectations.
On July 27, 1993, the respondent, Pamela, signed yet another service agreement. In it, she agreed, inter alia, to maintain contact with ECAR, to attend Project Courage and undergo inpatient treatment if she was unable to stop using drugs, to be drug free until her new baby was born and to obtain prenatal care, and to keep her scheduled visits with Shanbash.
On August 3, 1993, Evelyn B. was born to Pamela and Efrain B. This was Pamela's fifth child. At birth, Evelyn tested positive for cocaine and syphilis. Pamela had withheld from hospital personnel that she had syphilis, although this could have threatened Evelyn's life. Pamela admitted using cocaine two days prior to Evelyn's birth. She also admitted using cocaine on August 5, 1993 while she was in the hospital. On August 6, the Department filed a neglect petition and a coterminous petition to terminate parental rights with respect to Evelyn, together with an application for an order of temporary custody. That same day, CT Page 9752 the court granted the application for an order of temporary custody.[4] At the hearing, on August 12, 1993, the court ruled that the order should remain in effect. Expectations again were issued to the mother, instructing her to visit Evelyn as often as the department permitted, to complete the inpatient drug treatment program at Crossroads or at Gaylord Hospital and to comply with aftercare provisions, to secure and maintain adequate housing and income, and to engage in no substance abuse. On September 1, 1993, Evelyn was committed to the custody of the commissioner. At or about this time, Efrain B. appeared the Department's local office and threatened to harm the social worker employed with Bridgeport Community Health and the ECAR program. Thereafter, ECAR would not provide transportation to Pamela.
On August 26, 1993, Pamela's social worker wrote to her informing her that she had been accepted for admission to Gaylord Hospital on September 2, 1993 and that she would be picked up "promptly at 9:00 a.m." that day. Nonetheless, Pamela failed to appear. She also missed her next appointment for admission to Gaylord. On the third appointment, however, Pamela was admitted in-patient at Gaylord Hospital.
During her first week at Gaylord, Pamela remained in denial. During her second week, she began to respond positively. In therapy sessions she related that Efrain B. used drugs and would be an obstacle and not an asset to her recovery.[5] On October 14, 1993, Pamela signed another service agreement with the Department in which she agreed, inter alia, to complete the Gaylord program and attend Project Courage immediately upon her discharge, to remain drug and alcohol free, to cooperate with the ECAR program, and to keep all scheduled visits with Shanbash and Evelyn. On October 19, 1993, Pamela was discharged from Gaylord Hospital.
Pamela was provided with transportation to Project Courage. The urine samples which Pamela did provide while at Project Courage tested positive for cocaine. On the third day she was to attend Project Courage, Efrain B. emerged from the home and advised that Pamela would no longer be attending. Pamela never again attended Project Courage, nor did she generally attend scheduled visits with Shanbash and Evelyn, nor did she cooperate with ECAR.
Efrain B. never visited his children, except for one twenty CT Page 9753 minute visit with Shanbash. He never requested visits with them nor did he contact them in any way.
"Our statutes define the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . General Statutes § 45-61b(g) [now § 45a-707(g)]. It is a most serious and sensitive realm of judicial action.Anonymous v. Norton, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294, 46 L.Ed.2d 268 (1975). . . . To justify the termination of parental rights in the absence of consent, one or more of the grounds set forth in General Statutes § 17-43a [now § 17a-112] must be proven by clear and convincing evidence. In re Juvenile Appeal (84-3), [1 Conn. App. 463, 467,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)];see In re Juvenile Appeal (83-CD), 189 Conn. 276, 296,455 A.2d 1313 (1983). In re Juvenile Appeal (84-6), 2 Conn. App. 705,707-708, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801,487 A.2d 564 (1985)." (Internal quotation marks and footnote omitted.) In re Michael M., 29 Conn. App. 112, 117-118,614 A.2d 832 (1992).
"Section 17-43a [now § 17a-112] carefully sets out . . . four situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. [DCF[6]] in petitioning to terminate those rights, must allege and prove, by clear and convincing evidence, one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and, in fact, usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings can begin. No all-encompassing `best interests' standard vitiates the requirement of compliance with the statutory criteria. In re Luis C., 210 Conn. 157, 165, 554 A.2d 722
(1989), quoting In re Juvenile Appeal (Anonymous), 177 Conn. 648,671-72, 420 A.2d 875 (1979)." (Internal quotation marks omitted.) In re Michael M., supra, 29 Conn. App. 118.
Pursuant to General Statutes § 17a-112(b),[7] the commissioner has brought petitions to terminate both parental rights respondents' with respect to Shanbash and Evelyn. As to both children the commissioner relies on grounds "2" and "3" of that subsection. That is, the CT Page 9754 commissioner claims that both children have previously been found to have been neglected and that the respondents "have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, they could assume a responsible position in the life of the child." The commissioner also claims that each "child has been denied, by reason of an act or acts or parental commission or omission, the care, guidance or control necessary for his [other] physical, educational, moral or emotional well-being." Finally, the commissioner claims that Efrain has abandoned his children. See General Statutes § 17a-112(b)(1).
SHANBASH
 1. Failure to Rehabilitate
That a parent has failed to achieve some or all court expectations does not necessarily mean that the parent could not assume a responsible position in the child's life. In re LuisC., 210 Conn. 157, 167, 554 A.2d 722 (1989); In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532, cert. denied, 199 Conn. 809,508 A.2d 770 (1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463,478, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259
(1984). "[H]owever, . . . as it is presently written § [17a-112] requires parental rights to be terminated if by clear and convincing evidence it is established that the respondent's level of rehabilitation falls short of the level which would `encourage the belief that within a reasonable time, considering the age and needs of the child," the parent could assume a responsible position. . . . Thus, the statute requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.' There may be instances in which the evidence does not establish that parental rights should be terminated under this section, despite the fact that continuing support programs for the parent maybe suitable or even necessary." (Emphasis by the court.) In reLuis C., supra, 210 Conn. 167.
Based on clear and convincing evidence the court finds that Shanbash has been found by the superior court in a previous proceeding to have been neglected and that the respondent Pamela has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time CT Page 9755 considering the age and needs of Shanbash, she could assume a responsible position in his life. Shanbash is but a toddler, little over two years of age, and as such is totally dependent upon his caretaker. His mother has been a cocaine addict since before his birth and remains an addict today, in denial, despite substantial efforts by the Department and despite her having gone through inpatient treatment. See In re Christine A.,20 Conn. App. 228, 565 A.2d 880 (1989). Her drug addiction and consequential irresponsibility nearly killed this child when he was only a few weeks old. It is not reasonably foreseeable when, if ever, she will overcome her drug addiction and be able to assume a responsible position in this infant's life.
The court further finds upon clear and convincing evidence that Shanbash's father, Efrain B., has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Shanbash's age and needs, he could assume a responsible position in Shanbash's life. Efrain not only is a drug user himself, he is a motivating force in Pamela's continued drug usage and a major obstacle to her ability to overcome her addiction. That he would continue to encourage a mother of such infant children to resume cocaine use after in-patient treatment underscores both the perverse influence Efrain has on Pamela and that there is no reason to believe that within a reasonable time he could assume a responsible position in the life of Shanbash.
2. Acts of Parental Commission or Omission
Based on clear and convincing evidence the court finds that Shanbash has been denied, by reason of an acts or acts of parental commission or omission, the care necessary for his physical well-being. General Statutes § 17a-112(b)(3). This finding is based on his parents failure to obtain regular medical attention for him, their failure to have him timely inoculated against childhood diseases and, especially, on the dilution of his formula which lead to his suffering water intoxication, endangering Shanbash's life.[8] However, this ground applies to Efrain B. as well as to Pamela. Efrain lived with Pamela and Shanbash whenever he wanted to. He cannot escape responsibility for endangering his son's life by virtue of his neglect while living at home or his neglect by voluntarily absenting himself from the home and leaving his son in the care of a drug dependent mother. CT Page 9756
EVELYN
The commissioner alleges the same grounds for termination of parental rights with respect to Evelyn as she does with respect to Shanbash. However, with respect to Evelyn, the commissioner, as a matter of law, cannot prove that "the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for h[er] physical, educational, moral or emotional well-being." General Statutes § 17a-112(b)(3). This is because Connecticut law does not permit the court to rely on prenatal conduct of the parent of a child as grounds for terminating the parent's parental rights with respect to that child; cf.In re Valerie D., 223 Conn. 492, 613 A.2d 748
(1992); and because custody of Evelyn was granted to the commissioner three days after her birth. "Thus, she could not have been denied the care, [guidance], or control necessary for her physical, educational, moral or emotional well-being by reason of parental acts of commission or omission. . . ." In re Kelly S., 29 Conn. App. 600,614, 616 A.2d 1161 (1992).
However, Evelyn has been found by the superior court in a prior proceeding to have been neglected. As articulated supra, and based on clear and convincing evidence, the court finds that the respondents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child."[9] Further, Efrain's failure to attend a scheduled psychological evaluation and his failure to attend five of the six trial dates further evidences his lack of intention to rehabilitate himself and to assume parental responsibilities.
3. Abandonment
In its petitions, the commissioner alleges that Efrain has abandoned Shanbash and Evelyn. General Statutes § 17a-112(b) provides that parental rights may be terminated if "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." "Th[is] statutory definition [of abandonment] differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be proved." In re Shannon S., 41 Conn. Sup. 145,151, 562 A.2d 79 (1988), affirmed and adopted, 19 Conn. App. 20,560 A.2d 993 (1989); compare Glotzer v. Keyes, 125 Conn. 227, CT Page 9757 233, 5 A.2d 1 (1939) (at common law "[t]o constitute abandonment there must be an intention to abandon or relinquish accompanied by some act or omission to act by which such intention is manifested."). "Where the legislature has specifically defined an operative term used within a statute, [courts] are bound to accept that definition . . . unless to do so would create an irrational result that could not have been intended by the legislature." Weinberg v. Vending Co., 223 Conn. 336, 349,612 A.2d 1203 (1992).
"Abandonment focuses on the parent's conduct." In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801
(1981); see In re Michael M., 29 Conn. App. 112, 121, 614 A.2d 832
(1992); In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897 (1987). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child.In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985). . . . In re Michael M., supra. Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. In re Juvenile Appeal (Docket No. 9489), [supra,] 183 Conn. 14." (Internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12,18, 632 A.2d 1122, 228 Conn. 915, 636 A.2d 847 (1993).
The commissioner has proven this ground by clear and convincing evidence. Efrain has actively endeavored to keep the children's mother using cocaine, he has visited Shanbash only once since his commitment and has never visited Evelyn. He has shown no interest in his children since their commitments. During the months prior to Shanbash's commitment, Efrain shared responsibility for the neglect which nearly resulted in that infant's death. Efrain appeared at only two of many pretrial court hearings and appeared in court only once during the trial of this case. See In re Santos A., Superior Court, Judicial District of New Haven at Meriden, No. N. 89-110 (1990) (Blue, J.). The court finds that he has abandoned his children within the ambit of General Statutes § 17a-112(b)(1).
FINDINGS
General Statutes § 17a-112(d) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall CT Page 9758 consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
Soon after Shanbash's birth, and in fact even prior to his birth, the Department provided services to Pamela. Pamela was provided with a parent aide, an intensive family preservation worker, and a social worker. Pamela was intermittently involved with Project Courage, the ECAR program and was an admitted patient at Gaylord Hospital. After Evelyn's birth, the principal services offered to Pamela were the inpatient program at Gaylord Hospital and Project Courage. After Pamela's return to cocaine usage after her discharge from Gaylord Hospital, no rehabilitation was foreseeable and providing her or Efrain with services would have been beyond what reasonableness required. While the Department did not hound Efrain to accept its services, any further effort by the Department with respect to him would have been futile, if not fantasy. Whenever the DCF social worker visited the home while Efrain was there, he would wander into another room and not engage himself. He never inquired about his children after they went into foster care. He knew how to contact the social worker but did not do so. He never visited Evelyn and visited Shanbash only once, in May 1993, for twenty CT Page 9759 minutes. He had no other visits, nor did he request visits with his children. The children, therefore, have no idea who he is. Pamela was appropriate with the children during visits and they enjoyed her company, but they did not identify her as their mother. The court is unable to make findings with respect to the children's feelings and emotional ties with their foster parents. Efrain has not made any significant efforts to adjust his circumstances and conduct so as to make it in the best interests of the children to return to his home in the foreseeable future. As discussed supra, Pamela did make such a significant effort by entering the inpatient program at Gaylord Hospital. However, that, effort failed; she promptly returned to cocaine use upon her discharge. Neither parent has been prevented from maintaining a meaningful relationship with the children by the unreasonable act or conduct or anyone or by the respondents' economic circumstances.
One Year Waiting Period
"General Statutes § [17a-112(b)] provides that the court may terminate parental rights if it finds that `over an extended period of time, which . . . shall not be less than one year,' at least one of the four statutory grounds for termination exists. Since the grounds are in the disjunctive, the court need find only one ground to grant the petition. In re Juvenile Appeal (84-BC),194 Conn. 252, 258, 479 A.2d 1204 (1984)." In re Saba P.,13 Conn. App. 605, 609, 538 A.2d 711, cert. denied, 207 Conn. 811,541 A.2d 1241 (1988).
The court is aware that the one year period does not necessarily commence from the date of the child's commitment. Inre Saba P., supra, 13 Conn. App. 609. However, the one year period terminates on the date the petition to terminate parental rights is filed or the date on which an amendment to the petition is filed. See Practice Book § 1042.1(4) ("In the adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment."). The statutory one year period is satisfied with respect to Shanbash as it relates to the respondents' failure to rehabilitate. It is not satisfied with respect to Shanbash having been denied, by reason of an act or acts or parental commission or omission, the care, guidance or control necessary for his physical well being. Nor is the one year period satisfied with respect to Evelyn since less than one year elapsed between her birth and the filing of the petition to terminate her parents' parental rights. CT Page 9760
However, "[t]he court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." General Statutes § 17a-112(c); see In re Christine F.,6 Conn. App. 360, 371-372, 505 A.2d 734, cert. denied,199 Conn. 808-809, 508 A.2d 1352 (1986). Based on the totality of the circumstances surrounding these children, as reflected in the foregoing facts and in the testimony of Dr. Ruth Grant,[10] the court finds that a waiver of the one year period is necessary to promote the best interests of each child. For the same reasons, the court finds upon clear and convincing evidence that termination of the respondents' parental rights is in the best interests of each child. Their parental rights hereby are ordered terminated with respect to Shanbash C. and Evelyn B.
It is further ORDERED that the commissioner of DCF be appointed statutory parent for the purpose of placing Shanbash and Evelyn in permanent homes, and, to ensure achievement of this necessary end, the said commissioner is ORDERED to submit to this court, in writing, a report as to the progress in achieving permanency no later than ninety days following the date of this judgment, and thereafter in such form and at such intervals as this court may from time to time require. If either one of these children is not placed in final adoption by December 10, 1995, the commissioner is hereby ORDERED to submit by that date a motion to review plan for terminated child to be in conformance with federal law.
The respondents have twenty days from the date of this judgment in which to appeal to the appellate court. If an appeal is requested and trial counsel is willing to continue representation, this court will appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book § 4017. If, however, in the exercise of professional judgment as an officer of the court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book § 4040. Such motions, if unopposed, will be granted ex parte and a new attorney may be appointed to review this record and make an independent determination of the merits CT Page 9761 of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the court clerk of the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Cf.Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501, 208 A.2d 756
(1964). If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding; see Anders v. California,386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); it is appropriate where there are such important interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Bruce L. Levin Judge of the Superior Court